# EXHIBIT A-1
# TO NOTICE OF REMOVAL

EFiled: Feb 16 2024 06:46PM EST
Transaction ID 72071766
Case No. 2024-0122-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LANDBRIDGE PORT SERVICES     )
(HONG KONG) LTD.,     )
    )
     Plaintiff,     )
    )
     v.     )   C.A. No. 2024 -_____
    )
NOTARC PORT INVESTMENT LLC,     )   PUBLIC VERSION FILED
NOTARC INVESTMENT PARTNERS     )   - FEBRUARY 16, 2024
LLC, COASTAL INFRASTRUCTURE     )
PARTNERS LLC, COASTAL     )
INFRASTRUCTURE TRUST NO. 1,     )
LIANG ZHANG, DION L. BOWE,     )
LESLIE C. BETHEL, COLIN MICHAEL     )
MARTINEZ, and SINOLAM     )
CONSULTING & TRADING     )
HOLDINGS PTE. LTD.,     )
    )
     Defendants.     )

## VERIFIED COMPLAINT

Plaintiff Landbridge Port Services (Hong Kong) Ltd. ("Plaintiff" or "Landbridge"), by and through its undersigned attorneys, files this Verified Complaint against Defendants Notarc Port Investment LLC ("Notarc Port"), Notarc Investment Partners LLC ("Notarc Partners," together with Notarc Port, the "Notarc Entities"), Coastal Infrastructure Partners LLC ("Coastal Partners"), Coastal Infrastructure Trust No. 1 ("Coastal Trust," together with Coastal Partners, the "Coastal Entities"), Liang Zhang ("Zhang"), Dion L. Bowe ("Bowe"), Leslie C.

Bethel ("Bethel"), Colin Michael Martinez ("Martinez," together with Zhang, Bowe, and Bethel, the "Individual Defendants"), and Sinolam Consulting & Trading Holdings PTE Ltd. ("Sinolam"), and alleges as follows:

## NATURE OF THE ACTION

1.    This case arises from a brazen and intricate scheme that Defendants have carried out over the course of several years to illegally take from and deprive Plaintiff of its ownership interests and the benefits of its investments in a valuable, landmark port project in the Republic of Panama (the "Panama Project" or "Project").  The end result of these illegal machinations was the transfer of the rights to the Project and ownership interests in related companies from Plaintiff to Notarc Port in March 2022 (the "Notarc Transaction").[1]

2.    Defendants have been seeking to disguise the Notarc Transaction as a bona fide transaction amongst disinterested and unrelated parties.  To that end, in September 2023, Notarc Port – the end recipient of the illegal transfers and one of the key perpetrators of the illicit theft scheme – initiated a sham arbitration

---

[1]  Defendant Zhang has claimed in the court proceeding underway in Barbados that Defendants Bowe and Bethel together own 100% membership interest in Defendant Notarc Port.  As discussed *infra* ¶¶ 122-46, 209, Plaintiff has serious reservations about the veracity of Zhang's assertion to this effect, as certain information in possession of Plaintiff suggests that Zhang might be the true owner of Notarc Port, instead of Bowe and Bethel. Regardless of who actually owns Notarc Port, it is undeniable that Zhang, Bowe, and Bethel caused Notarc Port to be formed in Delaware to carry out the illegal Notarc Transaction.

proceeding (the "Sham Arbitration") in Panama aimed at obtaining a declaration that it is a bona fide, good faith purchaser of four companies with interests in the Panama Project ("Panama Project Companies").

3.    The Individual Defendants – that is, Bowe, Bethel, Zhang, and Martinez – own and control the entities involved in the illegal transfers and every party to the Sham Arbitration. These Individual Defendants are the ones who have been conspiring and working together since 2019 to illegally take the rights to the Project and ownership interests in the Panama Project Companies from Plaintiff, culminating in the complete theft of these assets in March of 2022 through the Notarc Transaction.

4.    The Individual Defendants created the various Delaware Entities to carry out and consummate their brazen theft of Plaintiff's assets. And they are now pursuing the Sham Arbitration, by and against entities they own and control, to attempt to insulate their theft as a bona fide, arm's length transaction.

5.    Through the Sham Arbitration, Defendants seek an arbitral award declaring Notarc Port as a bona fide purchaser. Defendants will then take that award and sell or otherwise encumber the Panama Project Companies to further enrich themselves from the theft. Absent this Court's halting the Sham Arbitration, this outcome appears very likely. Plaintiff therefore asks this Court for an emergency and then permanent order enjoining Defendants from further conducting the Sham

3

Arbitration in Panama or taking any other steps to encumber the assets that they illegally converted.

6.      Defendants' theft of Plaintiff's assets took place through a series of fraudulent and illegal steps that the Individual Defendants implemented from 2020 through 2022.  First, Defendant Zhang used forgery and illegal corporate actions to divest Plaintiff of its 51% interest in Landbridge Holdings, Inc. ("LHI"), a Barbados holding company that wholly owned four Panamanian companies:  Panama Colon Container Port, Inc. ("PCCP"), United Crown Construction, Inc. ("UCC"), Central America Shopping Mall, Inc. ("CASM"), and Isla Margarita Development Inc. ("IMD," and, together with PCCP, UCC, CASM, the "Panama Project Companies").

7.      The Panama Project Companies are LHI subsidiaries that own the lands and valuable concession rights to develop, construct, operate, and manage the Panama Project, which consists of a container port terminal and adjacent logistics park in Margarita Island, Colon Province, Panama.  The Project is strategically located at the Atlantic entrance to the Panama Canal.

8.      Taking advantage of the lull in international commerce created by the COVID pandemic, Zhang, then a director of LHI, conveyed all shares that Plaintiff held in LHI to his wholly-owned Singapoeran corporate entity, Sinolam, in July 2020, using forged share transfer instruments.

4

9.     The second step of the theft scheme was to use Zhang's ill-gotten control of LHI to reorganize that company, as well as LHI's wholly-owned Panamanian subsidiaries, *i.e.*, the Panama Project Companies, all with the purpose of consolidating Zhang's control so that he could start diverting and transferring LHI's assets, including the Panama Project Companies, to the entities that the Individual Defendants created in Delaware.  To that end, without notice to Plaintiff and during the period between August 2020 and June 2021, Zhang removed all of the directors named to the boards of LHI and the Panama Project Companies by Plaintiff and filled the same with his cronies—co-conspirators, Defendant Martinez and non-party Ms. Tingyun Han ("Han").

10.     The third step of the scheme consisted of stripping LHI of all of its voting rights in the Panama Project Companies and materially diluting LHI's ownership of and rights in these companies.  Specifically, in July 2021, Zhang and his operatives within the Panama Project Companies, including Han and Martinez, caused the Panama Project Companies to annul LHI's existing shares and issue to LHI much less valuable and diluted non-voting shares.  They then caused the Panama Project Companies to issue a new class of shares with voting rights to Defendant Coastal Partners, a Delaware LLC then wholly owned by Defendant Coastal Trust, a Delaware trust for which Martinez has been serving as trustee.

5

11.    The Individual Defendants created and utilized the Coastal Entities for the sole purpose of carrying out this illegal step aimed at siphoning LHI's assets away from Plaintiff's reach, and reducing their ownership and control rights over them. *The Coastal Entities did not pay any consideration to acquire those newly-issued shares with exclusive voting rights.*

12.    Having illegally taken control of LHI and then having diluted its ownership and transferred its voting control of the Panama Project Companies to the Coastal Entities, Defendants executed the last step of their scheme to cloak this wrongdoing by organizing and carrying out the Notarc Transaction in March 2022. As a result of the Notarc Transaction, Notarc Port became a 100% owner and controller of the Panama Project Companies, leaving Plaintiff with no further rights or ownership over these companies or their assets, including the Panama Project.

13.    To effect this last step of the illicit theft scheme, Bowe and Bethel created Notarc Port in Delaware in November 2021.  Then, Zhang and Martinez, supposedly acting as "sellers," sold all of Coastal Trust's interests in Coastal Partners – that is, the entity holding all voting shares in the Panama Project Companies, to Notarc Port – for $1.  Through this transaction that took place on March 22, 2022, the conspirators made Notarc Port the controlling owner of the Panama Project Companies, and their assets, including the Panama Project – a very valuable infrastructure project – *for a single dollar*.

14.    On the same date, Zhang also transferred all of LHI's shares (now comprised only of non-voting shares) in the Panama Project Companies to Notarc Port for just $80,303.  As such, the conspirators positioned Notarc Port as 100% owner of the Panama Project Companies and their assets, completely removing LHI from the chain of ownership of said companies.

15.    When combined, the sum of $80,304 (*i.e.*, $1 plus $80,303) that Notarc Port allegedly paid to acquire a 100% interest in the Panama Project Companies from Coastal Trust and LHI, is but a pittance and an infinitesimal fraction of the fair value of the Panama Project.  This strongly evidences that the Notarc Transaction was a mere façade for the Defendants' illicit operations to consummate the theft and shield themselves from their misconduct.

16.    The Notarc Transaction unjustly enriched each of the Individual Defendants (as well as the corporate entities under their ownership and control).  As a result of the Notarc Transaction, Bethel and Bowe, through the Notarc Entities, gained control of an immensely valuable port project for almost nothing.

17.    With respect to Zhang, prior to the Notarc Transaction and using his illicit control over the Panama Project Companies, Zhang encumbered the Panama Project Companies with significant liabilities in an amount exceeding $230 million by having them enter into shady (and likely paper-only) loan arrangements with a Barbadian entity named Gorgeous International, Inc. for which Zhang served as the

sole shareholder. Zhang made a further arrangement with Bethel and Bowe as part of the Notarc Transaction, so that profits from the Panama Project flow back to Zhang in the form of repayment of these so-called debts. Zhang, through Sinolam, continues to own 100% of LHI as well.

18.   Martinez, who Zhang installed as Director-President of the Panama Project Companies in June 2021 and who in that capacity authorized the divesture of LHI's voting rights in the Panama Project Companies in favor of the Coastal Entities, continues to serve as Director-Treasurer of the Panama Project Companies to date. In other words, Martinez worked together with and for Zhang to deprive LHI's voting control over the Panama Project Companies and dilute LHI's ownership interests in them, and now continues to work together with Zhang as well as with and for Bowe and Bethel, who are the supposed new owners of the Panama Project Companies.

19.   Defendants arranged this labyrinthine series of exchanges to mask the illegal nature of the Notarc Transaction, and to disguise Notarc Port as a bona fide purchaser of the Panama Project Companies. They did so, in large part, to continue their unjust enrichment and illegal ownership and conversion of these assets, even if all fraudulent and illegal transfers preceding the Notarc Transaction were eventually exposed and nullified.

20.     Plaintiff became aware of the Notarc Transaction in May 2022, when it was publicly announced by Bowe and Bethel.  When making this announcement in May 2022, Bowe, Bethel and Zhang **concealed the identity** of the new owner of the Panama Project Companies (*i.e.*, Notarc Port).

21.     In spite of limited public information, Plaintiff conducted further investigations to learn that Zhang illegally made himself the sole owner of LHI via Sinolam.  Prior to Zhang's illegal transfers, Plaintiff owned 51% of LHI, which was the initial holding company of the Panama Project Companies, and thus was the owner of the Panama Project and all other assets belonging to these companies.

22.     Upon learning this, in February 2023, after sending cease-and-desist letters to the entities involved in the theft scheme, all of which were ignored, Plaintiff brought suit in Barbados where LHI was formed to begin to unravel and reverse the Defendants' swindle.  In that action, Plaintiff seeks to be reinstated as the rightful 51% stockholder of LHI and the nullification of all transactions relating to LHI carried out by Zhang and his co-conspirators (the "Barbados Action").

23.     Notarc Port, Notarc Partners, Coastal Partners, Coastal Trust, Bowe, and Bethel are not parties to the Barbados Action.  But they have been acting in concert with Zhang to sabotage and disrupt the Barbados Action.

24.     Particularly on September 26, 2023, knowing that Plaintiff was vigorously prosecuting the Barbados Action, Notarc Port, working in concert with

the other Defendants to this case, initiated the illegitmate Sham Arbitration in Panama, seeking to have it declared a bona fide purchaser of the Panama Project Companies. Coastal Partners and the Panama Project Companies – all of which Notarc Port currently illegally wholly owns – are co-claimants to the Sham Arbitration, along with Notarc Port. These entities are purportedly "adverse" to the respondents in the Sham Arbitration, the sellers in the Notarc Transaction: LHI and Coastal Trust – except that *they are working together and there is no real adversity between them*.

25.    Notarc Port has brought the Sham Arbitration to insulate Defendants' theft by seeking a declaration from the arbitral tribunal that: (i) the Notarc Transaction was valid and enforceable; and (ii) it is a bona fide purchaser for value of the Panama Project Companies. In its Arbitration Demand, Notarc Port attempts to cast the Sham Arbitration as a private proceeding brought by an independent third-party purchaser of these assets, seeking protection from prior, illegal transactions of which it was allegedly unaware. *In reality, the Sham Arbitration is the Individual Defendants using Notarc Port (to which the Individual Defendants transferred all of their ill-gotten gains) suing LHI and Coastal Trust (the other companies that the Individual Defendants utilized to steal and transfer these assets to Notarc Port) to concoct a legal judgment insulating themselves and Notarc Port from Plaintiff's efforts to unravel Defendants' fraudulent scheme*.

26.    Because all of the parties to the Sham Arbitration are owned by the Individual Defendants who have been working together to carry out the theft of Plaintiff's assets, the Sham Arbitration presents no real controversy.  Notarc Port and the remaining claimants will, in all likelihood, obtain their requested relief from the arbitral tribunal because the co-conspirators control what the parties will argue, the evidence the parties will present, and the appointment of all arbitrators.

27.    In a disingenuous attempt to legitimize the Sham Arbitration, the Individual Defendants, through Notarc Port, have been attempting to drag Plaintiff into that proceeding.  They have threatened to compel Plaintiff's participation even though Plaintiff has refused to participate and is not a party to any arbitration agreement with Notarc Port.  (A true and correct copy of email communications from Notarc Port's counsel to Plaintiff's counsel, dated September 28 and October 31, 2023, is attached as Exhibit 1.)  Notarc Port and/or the other claimants to the Sham Arbitration may at any moment attempt to hale Plaintiff into the Sham Arbitration.

28.    Defendants also have laid bare their plan behind the Sham Arbitration, which is to use the award obtained from that arbitration, regardless of Plaintiff's participation, to "***estop China Landbridge from asserting its rights in Panama and in other fora to the maximum extent permitted by applicable law***."  (Ex. 1.)

29.    The co-conspirators are also using the Panamanian legal system to pressure and retaliate against Plaintiff and its counsel for seeking to reverse their illegal machinations.  Shortly after Plaintiff sent cease and desist letters to the participants in the scheme and filed the Barbados Action, Notarc Port's subsidiaries in Panama and Bowe, lodged criminal complaints against Plaintiff, its parent company, Shandong Landbridge Group Co., Ltd. ("Landbridge Group"), Landbridge Group's Chairman, Mr. Ye Cheng, and the partners at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, counsel to Plaintiff and Landbridge Group.  These criminal complaints are not only baseless, but are also retaliatory and punitive.  They are intended to discourage Plaintiff from continuing to fight to regain its rightful ownership over the assets in dispute.  However frivolous they are, Defendants have placed Plaintiff and its counsel at the risk of criminal prosecution and imprisonment in Panama by filing these baseless criminal charges.

30.    Defendants are pressing the Sham Arbitration forward, which cannot involve any meaningful form of justice.  Plaintiff thus brings this suit to put an end to the co-conspirators' Sham Arbitration and fraudulent scheme.

31.    Because Notarc Port, as a Delaware LLC, is not subject to jurisdiction in Barbados, Plaintiff cannot rely on the Barbados Action to halt its participation in the Sham Arbitration.  The same is true for the other two Delaware Entities – Coastal Partners and Coastal Trust – that are the parties to the Sham Arbitration.

12

32.    For the same reasons, the eventual outcome of the Barbados Action *will not*, without the aid of this Court, vindicate Plaintiff's ownership of the Panama Project Companies.  Notarc Port's bogus claim to be a bona fide purchaser must be decided in this forum, where it is organized, much of the illegal behavior took place, and the ill-gotten gains flowing from the co-conspirators' illegal scheme.

33.    Plaintiff also seeks redress from Defendants' unjust enrichment, conversion, and civil conspiracy aimed at exercising wrongful dominion and control over LHI, the Panama Project Companies, and the Panama Project.

## PARTIES

34.    Plaintiff **Landbridge** is a company formed under the laws of Hong Kong and a wholly-owned subsidiary of Landbridge Group.  On September 14, 2017, Plaintiff acquired a 51% ownership interest in LHI, thereby becoming a majority owner of the entity that wholly owns the Panama Project Companies and their rights in the Panama Project.

35.    Defendant **Zhang** is one of the main perpetrators and instigators of the multiyear scheme designed to deprive Plaintiff of its majority ownership interest in LHI, the Panama Project Companies, and the Panama Project.  Zhang was an associate of the late Mr. Ko, a joint venture partner of Plaintiff in the Panama Project. Mr. Ko appointed Zhang to the board of LHI before his passing.  Zhang is the sole stockholder and director of Defendant Sinolam and non-party Gorgeous Colon

13

Holdings Co., Limited ("Gorgeous Colon"), two of the corporate entities Zhang used to illegally take over ownership and control of LHI from Plaintiff.[2]

36.    Zhang was also the sole stockholder of Gorgeous International, Inc. ("Gorgeous International"), a Barbados-registered company that purportedly held an outstanding "debt" of over $230 million to the Panama Project Companies, the purpose of which has never been ascertained, and was assumed by Notarc Port as part of the Notarc Transaction.  Zhang dissolved Gorgeous International before the Notarc Transaction even took place, meaning when its debt was assumed by Notarc Port, it was repayable to him directly as Gorgeous International's sole shareholder. (A true and correct copy of Gorgeous International's Certificate of Dissolution dated September 3, 2020 is attached as Exhibit 2.)

37.    Defendant **Notarc Partners** is a limited liability company that Bowe and Bethel organized under the laws of Delaware on September 30, 2021, with a

---

[2]    Zhang is also the sole stockholder and director of an entity called Notarc Global Investments Limited, registered in Hong Kong ("Notarc Global Hong Kong"), which appears on at least one membership certificate to wholly own Notarc Port (discussed below in ¶¶ 122-46).  Although Zhang has denied ownership of Notarc Port in the Barbados Action, Plaintiff harbors serious reservations as to whether Zhang, through Notarc Global Hong Kong or some other entity, actually retains some or all beneficial ownership in Notarc Port.  Importantly, Defendants have created at least three different entities that use or have attempted to use the name Notarc Global Investments Limited, which is the entity listed on the current stock certificate of Notarc Port as its only owner.

registered office of 8 The Green, Suite A, Dover, Delaware, 19901. Bowe and Bethel each hold 50% of membership interest in Notarc Partners.

38.    In the Barbados Action, Zhang has submitted a sworn affidavit dated January 18, 2024 (a true and correct copy of which is attached as Exhibit 3) claiming that Notarc Partners is the sole member of Notarc Port owning 100% membership interest and, therefore, that Bowe and Bethel are the owners of Notarc Port via Notarc Partners. Zhang's affidavit encloses a letter and various documents received by him from counsel for Notarc Port, Paul Hastings LLP (hereinafter referred to as the "PH Submission"), which allegedly support Zhang's contention that Bowe and Bethel own Notarc Port via Notarc Partners. If Zhang's contention in the Barbados Action were to be credited, Bowe and Bethel would have caused Notarc Partners to form Notarc Port to engage in and consummate the illegal Notarc Transaction. Notarc Port does not do any other business.

39.    Defendant **Notarc Port** is a limited liability company Bowe and Bethel caused to be organized under the laws of Delaware on November 18, 2021[3] for the

---

[3]    As explained, *supra* n.2, while denying his ownership of Notarc Port in the Barbados Action, Zhang has also claimed that Bowe and Bethel each hold 50% membership interest in Notarc Port. Through the PH Submission, counsel for Notarc Port also affirmed Bowe and Bethel's ownership of Notarc Port, further representing that Bowe and Bethel have together owned 100% of membership interest in Notarc Port since the latter's formation on November 18, 2021. (*See* Ex. 3, at p. 38.) If these claims and representations are true, Bowe and Bethel – or Notarc Partners (and/or others) acting at the
(footnote continued)

purpose of engaging in the illegal Notarc Transaction, with a registered office of 8 The Green, Suite A, Dover, Delaware, 19901. Notarc Port acquired a 100% ownership interest in the Panama Project Companies and the Project in March 2022 by directly and indirectly acquiring 100% of the stock in each of the four Panama Project Companies. This transaction was purportedly preceded by a period of "negotiation" between Notarc Port and Zhang, and consisted of Notarc Port's purchase of both LHI's shares in the Panama Project Companies and Coastal Trust's membership interests in Coastal Partners, the entity holding all voting shares in the Panama Project Companies. In reality, the co-conspirators purposefully formed and used Notarc Partners, Notarc Port, Coastal Trust, and Coastal Partners—none of which does any other business—solely to further the conspiracy to steal the Panama Project Companies from Plaintiff.

40.    Defendant **Coastal Partners** is a limited liability company organized under the laws of Delaware on September 1, 2020 with a registered office of 8 The Green, Suite A, Dover, Delaware, 19901. When formed, Coastal Partners was named Green Ascent Smarter Energy LLC, a name similar to those of other

---

behest of Bowe and Bethel—would have formed Notarc Port in Delaware on November 18, 2021.

businesses affiliated with the Individual Defendants.[4]  The Individual Defendants, on June 17, 2021, changed its name to Coastal Partners, presumably to hide their affiliation with that LLC and as part of the illegal scheme to take Plaintiff's property and convert it for their own purposes and benefits.  Coastal Partners does not do any other business and was formed for the sole purpose of engaging in and facilitating this fraud.

41.    Coastal Partners became a stockholder of the Panama Project Companies as of July 1, 2021 when the Panama Project Companies, acting at the behest of Zhang and his appointees to the boards of the same – Martinez and Han – allegedly issued a new class of shares vested with exclusive voting rights to Coastal Partners.  Notarc Port claims it became the sole member of Coastal Partners by acquiring 100% of the interest in Coastal Partners from Coastal Trust in March 2022. This acquisition allows Notarc Port to claim indirect ownership of the shares that Coastal Partners holds in the Panama Project Companies.  Coastal Partners is also one of the claimants to the Sham Arbitration, along with Notarc Port and the Panama Project Companies.

---

[4]  Zhang owns or is otherwise affiliated with several entities incorporated in various jurisdictions that bears the name "Smarter Energy," such as Sinolam Smarter Energy LNG Power Co. in Panama.

42.    Defendant **Coastal Trust** is a trust created under the laws of Delaware, with a registered office of 8 The Green, Suite A, Dover, Delaware, 19901. Coastal Trust previously wholly owned Coastal Partners prior to selling it to Notarc Port in March 2022. Coastal Trust is a named respondent to the Sham Arbitration. The Individual Defendants have carefully concealed the identity of the beneficial owner(s) of Coastal Trust. Even in the Sham Arbitration, Notarc Port produced no document related to Coastal Trust's formation, ownership, or current status, although it asserts that Coastal Trust validly existed under the laws of the State of Delaware at all relevant times.[5] Notarc Port's claimed lack of documentation regarding Coastal Trust is inconsistent with its allegations in the Sham Arbitration that it conducted lengthy due diligence prior to the Notarc Transaction, as well as with the fact that Martinez, who serves as trustee and legal representative of Coastal Trust, is Director-Treasurer of the Panama Project Companies that are now under Notarc Port's control.

43.    As part of the Notarc Transaction, Coastal Trust sold 100% membership interest in Coastal Partners (and therefore, the exclusive voting rights in the Panama Project Companies that were vested with Coastal Pastners) for a single

---

[5]    *See* Notarc Port's Arbitration Demand (a true and correct copy of which is attached as Exhibit 4), at ¶ 28.

dollar.  Martinez, acting as trustee of Coastal Trust, agreed to and authorized this transaction.

44.    Defendant **Bowe** is one of the key principals of Notarc Management Group ("NMG"), along with Bethel. NMG is a Bahamian investment and asset management firm founded in 1999 by Bethel.

45.    Bowe and Bethel began working together with Zhang as early as 2019 to divest Plaintiff of its ownership interest in the Panama Project Companies.  This illegal scheme could not have been accomplished without Zhang first consolidating for himself ownership and control of LHI and the Panama Project Companies.  While Zhang's illegal maneuvers were underway, Bowe and Bethel continued working together with Zhang and created the Notarc Entities in Delaware to act as the ultimate recipient of the Panama Project Companies that were illegally divested from Plaintiff and its majority owned LHI.

46.    In addition to being a current director of Coastal Partners and a manager of the Notarc Entities, Bowe has been serving as Director-President of the Panama Project Companies since the Notarc Transaction in March 2022.  Additionally, Bowe is Chairman of Notarc Management Group Latin America, S.A. ("NMG Latin America"), which filed a Panamanian criminal complaint against Plaintiff and its counsel on February 15, 2023.  (A true and correct copy of Notarc Latin America's

corporate profile retrieved from the Panama Public Registry is attached as Exhibit 5.)

47.     Defendant **Bethel** is the other key principal of NMG, along with Bowe. Bethel is also Director-Secretary of Notarc Latin America, which filed a baseless Panamanian criminal complaint against David M. Orta, Lucas Loviscek, and Haiyan Tang on February 15, 2023.

48.     Based on the PH Submission, Bethel is a member of Notarc Partners, along with Bowe, and indirectly holds 50% membership interest in Notarc Port via Notarc Partners.  Bethel also is a manager of Notarc Partners.  As with Bowe, Bethel has worked together with Zhang at least since 2019 to accomplish their illicit theft scheme.

49.     Defendant **Martinez** is a close associate of Zhang.[6]  After illegally seizing ownership of LHI and the Panama Project Companies, Zhang removed Plaintiff's appointees to the boards of the Panama Project Companies and installed Martinez as Director-President of the Panama Project Companies.  That role, as explained above, is now being filled by Bowe following the Notarc Transaction in March 2022.  Martinez, however, continues to work with Bowe side by side in his new role as Director-Treasurer of the Panama Project Companies.

---

[6]  Both Zhang and Martinez worked together for the late Mr. Ko to build an electric power plant in Panama – a project unrelated to the Panama Project.

50.    While serving as Director-President of the Panama Project Companies, Martinez, along with Han, another close associate and employee of Zhang, convened several stockholder meetings on behalf of the Panama Project Companies without notifying Plaintiff.    Through these stockholder meetings, the Panama Project Companies issued a new class of shares vested with exclusive voting rights to Coastal Partners in July 2021, thus relegating LHI to the status of a non-voting stockholder in the Panama Project Companies with diluted ownership interest.

51.    Martinez serves as a trustee and legal representative of Coastal Trust. In that role, Martinez executed the transaction agreements to sell all of Coastal Trust's membership interests in Coastal Partners to Notarc Port for one dollar.  Also, before Bowe replaced him following the Notarc Transaction, Martinez served as a director of Coastal Partners.

52.    Defendant **Sinolam** is a company formed under the laws of Singapore. On or about July 28, 2020, Sinolam, through a series of fraudulent transfers orchestrated by Zhang and his co-conspirators, became the sole owner of LHI (and thus controlled the Panama Project Companies).  Zhang owns a 100% ownership interest in and is the sole director of Sinolam.  Acting at Zhang's behest and control, Sinolam appointed Han as the sole director of LHI.  Soon after LHI sold all of its shares in the Panama Project Companies to Notarc Port in March 2022, Sinolam authorized Han to apply for the dissolution of LHI on June 6, 2022.

## RELEVANT NON-PARTIES

53.    **LHI** is a company incorporated in Barbados that wholly owned the Panama Project Companies with full rights to the Panama Project Companies and the Panama Project, prior to being divested of that ownership and the attendant rights through Zhang's scheme.   Plaintiff acquired fifty-one percent (51%) of the shares in LHI on September 14, 2017, and participated in the development and operation of the Panama Project from that date until Zhang divested it of ownership through his scheme.

54.    **Mr. Ye Cheng** is a Chinese businessman who is the sole director of Plaintiff, as well as the chairman of Landbridge Group, a parent company of Plaintiff.  After Plaintiff became the majority owner of LHI, Mr. Ye also served as director and president of LHI until he was illegally removed by Zhang.

55.    **Mr. Ko** is a now-deceased Chinese businessman.  Prior to Plaintiff's investment in LHI, Mr. Ko was the sole owner of LHI and, thus, the Panama Project Companies.  Mr. Ko sold 51% of shares in LHI to Plaintiff on September 14, 2017 for $125 million.

56.    **Creaton** is a Hong Kong company that Mr. Ko controlled.   After forming the partnership with Plaintiff and Landbridge Group, Mr. Ko owned his 49% shareholding in LHI through Creaton.

57.    **Gorgeous Colon** is a company formed under the laws of Hong Kong. Mr. Ko previously wholly owned Gorgeous Colon, but in October 2019, Zhang became the sole owner of Gorgeous Colon.  Zhang then used Gorgeous Colon as an intermediary vehicle to illegally transfer Plaintiff's majority holding in LHI to Sinolam.

58.    **Han**, Zhang's assistant, was appointed by Sinolam – which Zhang owns and controls – as the sole director of LHI only a few days after Zhang made himself the sole owner of LHI through Sinolam.  Han had also served as Director-Secretary of the Panama Project Companies, and, in that role and acting together with Martinez, facilitated and participated in stockholder meetings in July 2021 whereby the Panama Project Companies issued a new class of shares with exclusive voting rights to Coastal Partners.  This resulted in the illegal dilution of LHI's ownership percentage in the Panama Project Companies, and further divested LHI of all voting rights in the Panama Project Companies.  Han, Zhang, LHI, Sinolam, and Gorgeous Colon (together, the "Barbados Defendants") are defendants to the Barbados Action that Plaintiff initiated to address Zhang and his accomplices' fraud.

59.    **Notarc Global Investments Limited** ("Notarc Global Hong Kong") is a company that Zhang formed under the laws of Hong Kong on July 14, 2021.  Since its formation, Zhang has been the sole stockholder and director of Notarc Global Hong Kong.  Zhang has claimed in the Barbados Action that Notarc Global Hong

23

Kong was created to pursue a potential joint investment in Southeast Asia, together with Bowe and Bethel. As such, Zhang has denied Notarc Global Hong Kong's connection to the Panama Project Companies or the Project, but the membership certificate of Notarc Port, which Notarc Port itself produced in the Sham Arbitration, identifies "Notarc Global Investments Limited" as its sole member owning 100% interest. This membership certificate raises serious questions about Zhang's claims in the Barbados Action. Plaintiff reserves its right to amend the Verified Complaint to add Notarc Global Hong Kong as a defendant should the discovery to be conducted in this case reveal Notarc Global Hong Kong's ownership of Notarc Port or its involvement in the illegal theft scheme.

60. **Gorgeous International** was a Barbados-registered entity for which Zhang served as sole shareholder and which was dissolved by Zhang on September 3, 2020. Gorgeous International previously held the right to the repayment of a mysterious "debt" from the Panama Project Companies of over $230 million, which Notarc Port assumed during the Notarc Transaction in March 2022. No reason for the origination of the debt has been discovered or offered as explanation, although Notarc Port claims in the Sham Arbitration that this "debt" Notarc Port assumed from the Panama Project Companies was part (and the principal amount) of consideration it paid toward the supposed purchase of the Panama Project Companies and their assets. When dissolving Gorgeous International, Zhang

assigned all the property of the company, including the right to the repayment of the "debt" purportedly owed to it previously by the Panama Project Companies and now by Notarc Port, *to himself*.  This series of arrangements has effectively positioned Zhang to continue extracting economic benefits from, and likely exerting control over, the Panama Project Companies and the Project, even following the Notarc Transaction.

## JURISDICTION AND VENUE

61.    Because Plaintiff seeks equitable relief in the form of a temporary restraining order, a preliminary and permanent injunction and the imposition of a constructive trust, this Court has jurisdiction over the causes of action stated herein pursuant to 10 *Del. C.* § 341, which gives the Court of Chancery jurisdiction "to hear and determine all matters and causes in equity."  This Court has jurisdiction over Plaintiff's claims for declaratory relief pursuant to 10 *Del. C.* § 6501.

62.    This Court also has jurisdiction under the "clean-up doctrine" to the degree that any of the claims herein are not deemed equitable in nature.

63.    This Court has personal jurisdiction over Notarc Port, Notarc Partners, and Coastal Partners by virtue of their organization as Delaware limited liability companies.

64.    This Court has personal jurisdiction over Coastal Trust by virtue of its organization as a Delaware trust.

65.    This Court has personal jurisdiction over Bowe and Bethel pursuant to 10 *Del. C.* § 3104(c) and 6 *Del. C.* § 18-109, and by virtue of their involvement in the formation of the Delaware Entities, their status as managers of Notarc Port, Notarc Partners, and Coastal Partners, and their participation in the illegal conspiracy described herein, and for being an alter ego of the Notarc Entities.

66.    This Court has personal jurisdiction over Zhang pursuant to 10 *Del. C.* § 3104(c), and by virtue of his involvement in the formation of the Delaware Entities and his participation in the illegal conspiracy described herein.[7]

67.    This Court has personal jurisdiction over Martinez pursuant to 10 *Del. C.* § 3104(c), 10 *Del. C.* § 3114, and 6 *Del. C.* § 18-109, and by virtue of his involvement in the formation of the Delaware Entities and his participation in the illegal conspiracy described herein, and for being a trustee of Coastal Trust as well as a former director and manager of Coastal Partners.

---

[7]    Upon information and belief, Zhang caused Coastal Partners (previously named as Green Ascent Smarter Energy LLC) to be formed in Delaware on September 1, 2020 and to change its name to Coastal Partners on June 7, 2021 – all to carry out the illegal theft scheme described herein. As also explained, there also is a possibility that Zhang used his Hong Kong entity, Notarc Global Hong Kong, in relation to the creation or formation of Notarc Port in Delaware. If as Zhang has alleged in the Barbados Action, Bethel and Bowe, who equally own Notarc Partners, own Notarc Port through Notarc Partners, they formed both of those companies in Delaware, with Zhang's knowledge, to carry out and consummate the last step in Defendants' scheme to illegally divest Plaintiff of its ownership interest in the Panama Project Companies.

68.    This court has personal jurisdiction over Sinolam pursuant to 10 *Del. C.* § 3104(c) and by virtue of its participation in the illegal conspiracy described herein.

69.    Venue is proper because the parties have never agreed to submit to the exclusive jurisdiction of any other court or arbitral tribunal and because Defendants Notarc Port, Notarc Partners, Coastal Partners, and Coastal Trust (collectively, the "Delaware Entities") are formed and organized in Delaware, all Defendants conspired specifically to perpetuate the fraud scheme by establishing and maintaining the Delaware Entities, all Defendants conspired to ensure that the Delaware Entities hold (or held) title to the shares of the Panama Project Companies at issue in this action, and because Plaintiff seeks relief under Delaware law.

## FACTUAL BACKGROUND

## I.    PLAINTIFF'S PARTICIPATION AND INVESTMENT IN THE PANAMA PROJECT

70.    In 2013, the Panamanian Maritime Authority ("PMA") granted the authority for the Panama Project Companies to develop and construct the Panama Project, issuing the concession rights in favor of PCCP and UCC.  However, the Panama Project Companies could not commence construction of the Project for several years, because their ownership lacked sufficient capital, know-how, and resources to develop the Project.

71.    Among the previous owners was Mr. Ko, who was one of the individual indirect stockholders of the Panama Project Companies.  Dissatisfied with the slow progress of the Panama Project, Mr. Ko reached out to Landbridge Group in 2015 to solicit its involvement in the Panama Project.

72.    At that time, Mr. Ko and his corporate entity, Shanghai Gorgeous Investment Development Co., Ltd. ("Shanghai Gorgeous"), were already working together with Landbridge Group on a separate gas development project.  In light of this ongoing business relationship, Mr. Ko sought to partner with Landbridge Group on the Panama Project as well.

73.    In January 2016, Mr. Ko bought out the remaining stockholders in the Panama Project Companies.  Mr. Ko then further reorganized the corporate structure by establishing LHI in Barbados to wholly own the Panama Project Companies.  In connection with this reorganization, in January 2016, the Panama Project Companies issued stock certificates certifying LHI as the owner of 49,000 common shares of PCCP (*i.e.*, 100% of the issued capital), 10,000 common shares of UCC (also 100% of the issued capital), and 36 common shares of CASM (also 100% of the issued capital).[8]  (True and correct copies of stock certificates issued by the Panama Project

_____

[8]   The reorganization process continued until April 2017, when LHI acquired 100% of the stock in two other Panamanian companies involved in the development of the Project – that is, Isla Margarita Resources, S.A. ("IMR") and IMD.  PCCP merged with IMR in
(footnote continued)

Companies to LHI on January 7, 2016 are attached as Exhibit 6.)  Mr. Ko became the sole owner of LHI as of January 2016.  (A true and correct copy of LHI's Register of Shares is attached as Exhibit 7.)

74.    Prior to and following this reorganization, Mr. Ko and Landbridge Group continued having discussions about Landbridge Group's potential involvement as an owner and partner in the Panama Project.  This prospect was especially interesting to both parties because of Landbridge Group's prior, successful experience in developing and operating international ports.

75.    Landbridge Group eventually became interested in the potential partnership with Mr. Ko because of the Panama Project's locational advantage and expected synergies with other ports that Landbridge Group operated in China.

76.    Mr. Ko needed a partner with a reputation and experience in port infrastructure and operation in order to move the Panama Project forward.  The pairing was thus a natural fit.

77.    While Mr. Ko and Landbridge Group's discussions were ongoing, Landbridge Group took proactive steps to get the Panama Project off the ground.  To this end, Landbridge Group helped PCCP retain an engineering, procurement, and

---

April 2018, before the fraudulent conspiracy in this matter began.  As with PCCP, UCC, and CASM, Notarc Port directly and indirectly acquired 100% of the stock in IMD as part of the Notarc Transaction in March 2022.

construction ("EPC") contractor for the Panama Project, including by introducing PCCP to, and helping it engage, this contractor.

78.    Landbridge Group also sent personnel to Panama with extensive experience in port development and construction, including Mr. Li Yejun, then-Vice President of Landbridge Group, and Mr. Wang Xiangfeng, then-manager of the company's construction department.  As a result of these efforts, the Panama Project began construction in June 2017.

79.    Around the same time, Mr. Ko and Landbridge Group agreed through the Framework Agreement, executed on June 16, 2017, on the specific terms of Landbridge Group's equity participation in the Panama Project, including payment of $125 million by Landbridge Group to Mr. Ko and Shanghai Gorgeous to acquire a majority ownership interest in LHI.  (A true and correct copy of the Framework Agreement is attached as Exhibit 8.)  Plaintiff's parent, Landbridge Group, is a party to that agreement, and Mr. Ko entered it through his company, Shanghai Gorgeous.

80.    The Framework Agreement limits either investor's ability to transfer equity ownership to any third party, requiring the non-transferring partner's written consent to such a transfer, as well as the sale of 1% equity to the non-transferring partner to ensure that the non-transferring partner would become the majority, controlling stockholder in the event of an equity transfer :

> Each Party should acquire the other Party's consent in writing when transferring the equity of Landbridge Holdings, Inc. held or controlled by each Party. Otherwise, the equity shall not be transferred. Each Party, when transferring the equity of Landbridge Holdings, Inc. that it holds or controls, must also transfer to the other Party 1% equity of Landbridge Holdings, Inc. that it holds or controls at the price of USD 2.5 million.

(Ex. 8, Clause 8.)

81.    The Framework further provides that the two partners must consent to any decisions on "important matters":

> After the closing the equity transfer, the Parties have the voting rights to various company matters based on 50%:50% equity ratio. The important matters shall be decided on a consensual basis. The Parties will respectively appoint one shareholder representative to participate in the management of Panama Margarita Island Port Project. All matters in the management of Panama Margarita Island Port Project must be decided upon the consensus of both Parties' shareholder representatives.

(Exhibit 8, Clause 9.)

82.    ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

31

83.    

84.    Subsequently, on September 14, 2017, Plaintiff acquired 51% of the shares of LHI from Mr. Ko for the sum of $125 million, and became the majority owner of the Panama Project Companies and their assets.  (A true and correct copy of LHI's share certificate No. 2 issued to Plaintiff on September 14, 2017 is attached as Exhibit 10; a true and correct copies of accompanying resolution of the board of LHI are attached as Exhibit 11; and a true and correct copy of a share transfer instrument executed amongst Mr. Ko, Plaintiff and Creaton on September 14, 2017 is attached as Exhibit 12.)  (*See also* Exhibit 7, a true and correct copy of LHI's Register of Shares.)

85.    On the same date, Mr. Ko also transferred 49% of the shares of LHI to his virtually wholly-owned corporate entity, Creaton.  (A true and correct copy of LHI's share certificate No. 3 issued to Creaton on September 14, 2017 is attached as

Exhibit 13.)   The resulting ownership structure of LHI and the Panama Project Companies is represented in the chart below.



86.    As explained, pursuant to the agreements entered amongst Landbridge Group, Plaintiff, Mr. Ko and his corporate entities, any change to this ownership structure, including transfer of shares in LHI or the Panama Project Companies explicitly required the consent of both Plaintiff and Landbridge Group, ███████

███████████.   After Plaintiff acquired the majority interest in LHI, the board of the LHI consisted of two representatives from Creaton (Messrs. Ko and Zhang) and two from Plaintiff (Mr. Ye Cheng and Mr. Li Yejun).  (A true and correct copy of LHI's notice of change of directors registered with the Barbados Corporate Affairs and Intellectual Property Office ("CAIPO") on July 11, 2018 is attached as Exhibit 14.)

87.    Representatives from Plaintiff, including Mr. Wang Xiangfeng and Mr. Li Yejun, also served on the boards of the Panama Project Companies and contributed their expertise in port development and construction.

88.    Zhang, representing Mr. Ko and Shanghai Gorgeous, also served as CEO and legal representative of the Panama Project Companies.

## II.    PLAINTIFF LEARNS IT HAS BEEN ILLEGALLY DEPRIVED OF ITS MAJORITY OWNERSHIP INTEREST IN THE PANAMA PROJECT

89.    Under Plaintiff's stewardship and investment, the Panama Project advanced substantially.

90.    In 2020 and 2021, COVID-19 became a global pandemic and Plaintiff's representatives from the boards of the Panama Project Companies returned to China.

91.    Plaintiff later learned that Zhang took advantage of the situation to illegally and secretly remove Plaintiff's representatives from the boards of the Panama Project Companies in May 2021.  In order to maintain the ruse, Zhang continued providing updates to Plaintiff on the development status of the Panama Project, but did not disclose his clandestine, illegal usurpation of the Panamanian companies.

92.    One such update from Zhang to Plaintiff was regarding the Panamanian government's public notices alleging PCCP's breach of its concession terms.  After Zhang secretly ousted Plaintiff's representatives from the boards of the Panama

Project Companies, the PMA, in June 2021, initiated the process to revoke the concession granted to PCCP (the "Concession") alleging the latter's failure to make certain payments in accordance with the terms of the Concession.

93.    Later in September 2021, the PMA also announced that PCCP had failed to comply with a local hiring mandate included in the Concession, requiring PCCP to hire a certain number of local residents for the Panama Project.  Zhang subsequently reported this announcement by the PMA to Plaintiff.  (A true and correct copy of an email from Zhang to Shanlong Yu, Landbridge Group's General Counsel, dated September 7, 2021, is attached as Exhibit 50.)

94.    When reporting these developments to Plaintiff, Zhang downplayed their significance by suggesting that this is a typical tactic by the Panamanian government to demand more payments from the concessionaire.  Based on Zhang's reports and updates, Plaintiff believed in good faith that the Project was progressing as usual, notwithstanding the Panamanian government's recent actions.

95.    It is now evident that Zhang was providing incomplete and misleading information to Plaintiff, while he was working together with the other Individual Defendants to effectuate the illegal theft of Plaintiff's assets.

96.    Plaintiff first learned that it might have been divested of its majority ownership interest in the Panama Project Companies in or around May 2022 when NMG issued a press release dated May 19, 2022 (attached as Exhibit 15),

announcing that NMG had acquired the Panama Project Companies and assumed control of the Panama Project.

97. NMG's May 19, 2022 press release came as complete shock and surprise to Plaintiff. Plaintiff had no reason to suspect that its ownership interest in the Panama Project Companies might have been transferred to a third party. At all times, neither Mr. Ye Cheng, as the Director and Chairman of LHI, nor Plaintiff, as the majority stockholder of LHI, was ever notified of any transaction contemplating the sale of the Panama Project Companies or the Panama Project to any third parties, nor have they ever consented to any such transfer. Mr. Ko and his companies also never sought or obtained the required consents pursuant to ███████████████ ███████████ the Framework Agreement.

98. NMG's May 19, 2022 press release described it as a "leading" investment and asset management firm that has the backing of "strategic capital partners, investors, and leading multinational firms" to complete the development and construction of the Panama Project. (Ex. 15.) It further identified Bethel as "CEO" of NMG and Bowe as "Managing Partner" of NMG's Latin America operations.

99. The press release also explained that NMG was seeking to partner with Terminal Investment Limited ("TIL") to complete construction of the Panama

Project. TIL is a subsidiary of Mediterranean Shipping Company S.A. ("MSC"), a global container shipping company based in Geneva, Switzerland.

100.    Plaintiff later learned that NMG in fact *did not acquire the shares* in the Panama Project Companies, and that this press release was part of the Individual Defendants' attempt to conceal that the Individual Defendants consummated their theft scheme using a Delaware entity – that is, Notarc Port.

101.    After the Notarc Transaction in March 2022, the Individual Defendants also requested that the PMA stop its process to revoke PCCP's concessions on the basis of NMG's alleged acquisition of the Panama Project Companies.

102.    Specifically, on April 19, 2022, Bowe, as the newly appointed President of PCCP, sent a letter to the PMA (a true and correct copy of which is attached as Exhibit 17), confirming that NMG is the "new owner" of PCCP and that it would make "billion-dollar investment" to complete the Panama Project. (Ex. 17.)

103.    These representations made to the Panamanian government were false, because NMG did not acquire the shares in the Panama Project Companies, but rather Notarc Port did.

104.    Moreover, the Notarc Transaction did not improve the financial conditions or development prospects of the Panama Project, because it was a mere sham transaction organized and carried out by and amongst the Individual Defendants to consummate and cement their theft of Plaintiff's assets by transferring

the entirety of the Panama Project Companies to Notarc Port.  As explained below, notwithstanding the Notarc Transaction, the Individual Defendants continue to own and exercise full control over the Panama Project Companies and the Project.

105.  Facing risk of PCCP's Concession being revoked by the PMA, however, the Individual Defendants falsely represented to the Panamanian government that NMG – allegedly, a "leading" investment and asset management firm – had become the new owner of the Panama Project Companies and that it would have sufficient resources to complete construction of the Project.

106.  The Individual Defendants did not have (and continue to lack) sufficient financial resources and expertise to pursue the development of the Panama Project, which contributed to the Panamanian government's attempt to revoke PCCP's Concession, as described above.

107.  And yet, the Individual Defendants' misinformation campaign proved successful.  On May 16, 2022, PMA ceased the process to revoke PCCP's Concession.  That decision by the PMA was publicly announced.  It also identified NMG as a new owner of the Panama Project Companies on the basis of the Individual Defendants' false representations.

108.  As a result, the Individual Defendants could no longer keep their illegal theft scheme hidden from Plaintiff.  NMG issued the press release on May 19, 2022,

from which Plaintiff first learned that its ownership interest in the Panama Project Companies and the Project might have been illegally transferred to a third party.

## III.   THERE REMAIN SERIOUS QUESTIONS ABOUT THE TRUE IDENTITY OF THE ULTIMATE OWNER(S) OF THE PANAMA PROJECT COMPANIES

109.   At the time that Plaintiff first learned of the Notarc Transaction, the only detail known to Plaintiff regarding the Defendants' illicit scheme was that NMG, led by Bowe and Bethel, had supposedly acquired the Panama Project Companies.

110.   Even that piece of information disclosed in NMG's May 19, 2022 press release eventually turned out to be false, because it was Notarc Port that acquired the Panama Project Companies via the Notarc Transaction in March 2022.

111.   While Plaintiff has been able to uncover much of the specifics of Defendants' illicit scheme through its own investigation and the disclosures it obtained from the Barbados Defendants in the Barbados Action, there still remain legitimate questions regarding the true identity of the ultimate beneficial owner(s) of the Panama Project Companies and the Project, as a result of Defendants' sustained misinformation campaign.

112.   NMG's press release dated May 19, 2022 (Ex. 15) initially led Plaintiff to believe that ownership of the Panama Project Companies had been transferred to NMG, which is known as a Bahamian entity.  (A true and accurate copy of Notarc

Management Group's website, which was retrieved from URL
https://www.notarc.com, is attached as Exhibit 51.)

113.   As a result, Plaintiff served a cease-and-desist letter on NMG on
October 25, 2022 (attached as Exhibit 18), demanding NMG to halt its illegal
ownership and control of the Panama Project Companies.

114.   NMG did not respond to this cease-and-desist letter.   Instead, on
February 15, 2023, NMG Latin America – an entity incorporated in Panama for
which Bowe and Bethel serve as directors – filed a criminal complaint (attached as
Exhibit 40) in Panama against Plaintiff and its counsel, alleging that Plaintiff's
cease-and-desist letter constitutes a crime of extortion made "with the purpose of
making [it] give up on the exercise and development of the project of which it is the
legitimate owner." (Ex. 40, at p. 7.)

115.   Bowe authored NMG Latin America's criminal complaint and falsely
suggested that NMG Latin America was the owner of the Panama Project Companies
and the Project.

116.   Zhang continued this sleight of hand by maintaining falsely in the
Barbados Action that it was NMG Latin America who acquired the Panama Project
Companies in March 2022, when in reality it was Notarc Port.

117.   Then, on July 29, 2023, Paul Hastings LLP ("Paul Hastings")
corresponded with Plaintiff's counsel to inform them that it was retained to represent

"Notarc and PCCP in connection with Landbridge matter." (A true and correct copy of Paul Hastings LLP's email to Plaintiff's counsel, dated July 29, 2023 is attached as Exhibit 42.) Plaintiff's counsel demanded that Paul Hasting specify which "Notarc" entity or entities it represents in connection with Landbridge matter," but Paul Hastings LLP declined to do so.

118. As explained, *supra* ¶¶ 24-30, on September 26, 2023, certain of the Defendants initiated the Sham Arbitration in Panama. Paul Hastings, as counsel for the claimants to the Sham Arbitration, including Notarc Port, subsequently shared the Arbitration Demand with Plaintiff's counsel.

119. In the Arbitration Demand, Notarc Port and the other claimants disclosed the terms of the Notarc Transaction, including the identity of the acquirer of the Panama Project Companies (*i.e.*, Notarc Port), as well as the amounts that Notarc Port supposedly paid in consideration to LHI and Coastal Trust to acquire a 100% of interest in the Panama Project Companies.

120. The Arbitration Demand was apparently accompanied by various exhibits (the "Sham Arbitration Exhibits"), including Notarc Port's membership certificate dated May 18, 2022 which was labeled as Exhibit CE-12 in the Sham Arbitration (the "May 18, 2022 Membership Certificate").

121. Given that LHI is a respondent to the Sham Arbitration and that LHI also is a party to the Barbados Action, Plaintiff sought LHI's production of the Sham

41

Arbitration Exhibits to Plaintiff.  In response, LHI produced the Sham Arbitration Exhibits to Plaintiff on December 18, 2023, including the May 18, 2022 Membership Certificate (attached as Exhibit 47).[9]

122.   The May 18, 2022 Membership Certificate identified "Notarc Global Investments Limited" as the sole member of Notarc Port holding 100% interest, as reproduced below (Ex. 47):

## LLC MEMBERSHIP CERTIFICATE

NOTARC Port Investment LLC

Organized in **Delaware**   Company Name   has a total of __1__ member(s) at __11/18/2021__ date

This certifies that **Notarc Global Investments Limited** is a member of the above named Limited Liability Company, and holds a __100__ % interest of the above named company, which is entitled to the full benefits of such membership.

123.   Based on its investigation, Plaintiff learned that Zhang incorporated an entity named "Notarc Global Investments Limited" in Hong Kong on July 14, 2021. (A true and correct copy of Notarc Global Hong Kong's Incorporation Form is attached as Exhibit 33.)  Zhang owns 100% of the shares of Notarc Global Hong

---

[9]   With the leave of the Barbados High Court, Plaintiff filed the May 18, 2022 Membership Certificate in the Barbados Action as an exhibit to Mr. Ye's affidavit filed on January 3, 2024 in that action.  Mr. Ye Cheng's affidavit, along with the May 18, 2022 Membership Certificate annexed thereto, are publicly available.

Kong.  (A true and correct copy of Notarc Global Hong Kong's 2022 and 2023 Annual Returns are attached as Exhibits 34 and 35.)

124.   Plaintiff further discovered that there is a limited liability company named "Notarc Global Investments Limited LLC" that was formed in Delaware on June 3, 2022 ("Notarc Global Delaware").

125.   Given that the formation of this Delaware LLC post-dates the May 18, 2022 Membership Certificate and that the May 18, 2022 Membership Certificate identifies Notarc Port's sole member as "Notarc Global Investments Limited" as such and without "LLC" at the end of the sole member's name, Plaintiff was legitimately led to believe that Notarc Global Hong Kong – which Zhang solely owns – is the 100% owner of Notarc Port.

126.   Zhang's apparent ownership of Notarc Port through Notarc Global Hong Kong further implied that Zhang could be the current owner of the Panama Project Companies via Notarc Port and that all claimants to the Sham Arbitration – *i.e.*, Notarc Port and its supposedly wholly-owned subsidiaries, Coastal Partners and the Panama Project Companies – were likely under Zhang's ownership and control.

127.   On this basis, on January 3, 2024, Plaintiff submitted its request to the Barbados High Court to issue an injunctive order requiring Zhang to take necessary steps to procure the discontinuance of the Sham Arbitration and restraining Zhang from disposing of, encumbering, or otherwise dealing with Plaintiff's assets,

including the Panama Project Companies and the Project ("Plaintiff's January 3 Request").

128.   Zhang responded to Plaintiff's January 3 Request on January 18, 2024 (the "Zhang's Response" or "Response").   (*See* Ex. 3, which includes Zhang's Response and accompanying exhibits, including the PH Submission.)   In his Response, which was filed in the form of a sworn affidavit, Zhang acknowledged his ownership of Notarc Global Hong Kong.  Zhang's Response (Ex. 3, ¶ 9(d).)

129.   Zhang however claimed that he is "not and never [has] been an owner, shareholder, or interest holder of Notarc Port . . ., whether directly or indirectly." (*Id*. at ¶ 9(a).)  He further claimed that "the ultimate beneficiary owners of Notarc Port … are Messrs[.] Leslie Bethel and Dion Bowe."  (*Id*.)

130.   Plaintiff's January 3 Request is still pending before the Barbados High Court.  In light of Zhang's denial of his ownership and control over Notarc Port, the utility of Plaintiff's requested injunctive order in the Barbados High Court remains questionable, even if it were to be granted by the Barbados High Court.

131.   To support his claim that Bowe and Bethel are the ultimate owners of Notarc Port, Zhang also filed the PH Submission as an exhibit to the Zhang's Response.  According to Zhang, in preparation of the Response, he wrote through counsel to counsel for Notarc Port, Paul Hastings, and asked Paul Hastings to provide him with all supporting documents relating to the identity of the ultimate

beneficial owner of Notarc Port. Paul Hastings complied with Zhang's request and furnished the PH Submission to Zhang, consisting of Paul Hastings's letter dated January 15, 2024 and various documents that, in Paul Hastings' view, confirm Bowe and Bethel's ownership of Notarc Port.

132.    The PH Submission claims that "Notarc Global Investments Limited" – the one identified in the May 18, 2022 Membership Certificate as Notarc Port's sole member – in fact refers to Notarc Investment Partners LLC (*i.e.*, Defendant Notarc Partners), which Bowe and Bethel "have owned and controlled 100% . . . from its formation [on September 30, 2021 in Delaware] to the present." (*Id*. at p. 38.)

133.    The PH Submission reaches this conclusion by alleging that "Notarc Global Investments Limited" is a trade name that Notarc Partners unsuccessfully sought to obtain in Kent County, Delaware in May of 2022.

> Notarc Investments Partners LLC attempted to create a trade name "Notarc Global Investments Limited" (the "**Trade Name**"), as reflected in a signed and notarized Registration of Trade, Business & Fictitious Name Supplemental Certificate dated 10 May 2022. … The Trade Name "Notarc Global Investments Limited" was intended to apply to Notarc Investments Partners LLC.

(*Id.* at p. 39.)

134.    The PH Submission further explains that despite Notarc Partners' attempt to create a trade name "Notarc Global Investments Limited" on May 10,

2022, the trade name was never registered because Notarc Partners utilized the "incorrect" registration form; and that Notarc Partners was not aware of the registration failure until very recently, as it had never been notified of the rejection of the registration of the requested trade name:

> Following receipt of [Plaintiff's January 3 Request, which Zhang provided to Paul Hastings], Paul Hastings sought to obtain the public filing and registration of the Notarc Investment Partners LLC's Trade Name to learn that the Trade Name was not publicly available. Paul Hastings subsequently enquired with the Kent County's Trade, Business & Fictitious Name department to learn that Notarc Investment Partners LLC had filed the incorrect certificate for registering its trade name on 10 May 2022. Although Notarc Investment Partners LLC should have filed an (original) registration certificate, Notarc Investment Partners LLC instead filed a supplemental certificate.

> […]

> Notarc Investment Partners LLC did not receive any acknowledgement or clarification from the Trade, Business & Fictitious Name department in Kent County, Delaware that this document was not received and/or registered. We understand that this Department does not send out acknowledgements in the usual course unless specifically requested.

(*Id.* at p. 40 & n. 3.)

135.  The "incorrect" registration form that was allegedly filed with the Kent County's Trade, Business & Fictitious Name department on May 10, 2022 (the "May 10 Form") was enclosed in the PH Submission.  (*See id.* at p. 59.)

136. As explained, *infra* ¶¶138-39, there is no firm proof that the May 10 Form was actually filed with the Kent County Prothonotary's Office on May 10, 2022, as claimed in the PH Submission. The form on its face does not bear any filing or receipt stamp. In addition, the May 10 Form was apparently sworn and subscribed only on May 11, 2022 in Florida, which strongly suggests that the filing was *not* made on May 10, 2022, if it was in fact ever filed or sent to the Kent County Prothonotary's Office.

137. Furthermore, as detailed at *infra* ¶¶ 172-89, Plaintiff knows that the Individual Defendants previously engaged in forgeries to illegally divest Plaintiff of its majority ownership interest in the Panama Project Companies, calling into doubt the documentation they are producing in relation to the supposed attempt to register the trade name in the Kent County Prothonotary's Office. This leaves the possibility that the May 10 Form might be a post-hoc construction by the Individual Defendants to attempt to disprove Zhang's ownership over Notarc Port given how prejudicial his ownership of Notarc Port would be for him in the Barbados Action.[10]

138. Plaintiff's own investigation also raises a credible suspicion as to whether the May 10 Form is an authentic document that was ever filed. As part of

---

[10]    If the discovery in this case proves Zhang's ownership over Notarc Port via his Notarc Global Hong Kong, Plaintiff reserves its right to amend the Verified Complaint to add Notarc Global Hong Kong as a defendant.

its investigation, Plaintiff caused the Delaware law firm of Berger McDermott LLP to conduct searches on the registration by Notarc Investments Partners LLC of any trade name in 2022.

139.   This search revealed that there is no record in the Delaware Kent County Prothonotary's Office of a trade name "Notarc Global Investments Limited" for Notarc Partners or of the May 10 Form.  The search also revealed that if any attempted registration of such a trade name was rejected, the applicant should have received a formal notice of rejection and reimbursement of the filing fee.  (True and correct copies of email communications between Berger McDermott LLP and Ms. Heather Murray, Clerk of the Kent County Prothonotary's Office, are attached as Exhibits 52 and 53.)  This means that if Notarc Partners had indeed filed the May 10 Form, it would have received a rejection notice, which is inconsistent with the assertion made in the PH Submission that "Notarc Investment Partners LLC did not receive any acknowledgement or clarification from the Trade, Business & Fictitious Name department in Kent County, Delaware that this document was not received and/or registered."  (Ex. 3 at p. 40 n.3.)

140.   Even accepting the contentions in the PH Submission at face value, it also raises questions about why Notarc Port sought to certify its purported sole member using *only* Notarc Partners' attempted trade name without ever confirming that such a trade name was never properly registered.

141.   What is also telling is that the claimed owners of Notarc Port, Bowe and Bethel, were aware of the existence of Notarc Global Hong Kong, which Zhang solely owns.  According to the Zhang's Response and the PH Submission, Bowe and Bethel specifically authorized the creation of "Notarc Global Investments Limited" in Hong Kong with that exact same name.  This authorization was apparently given on February 18, 2021.  (*Id*. at p. 19.)  The purpose of the authorization – as described in the Zhang's Response and the PH Submission – is for Zhang, Mr. Ko, Bethel, and Bowe to pursue business opportunities in Asia allegedly unrelated to the Panama Project.  (*Id*. at pp. 19, 41.)

142.   The PH Submission further claims that Zhang was supposed to dissolve Notarc Global Hong Kong because the alleged business opportunities did not materialize.  (*Id*. at p. 41.)  Zhang is now seeking to dissolve Notarc Global Hong Kong with Bowe and Bethel's support. (*Id*. at ¶ 33(f) ("On 14th January 2024, I instructed the corporate secretary of the company to start the necessary proceedings to dissolve the entity."); at p. 41 ("We understand that Mr. Zhang is promptly taking steps with the proper authorities in Hong Kong to dissolve [Notary Global Hong Kong], which Messrs. Bethel and Bowe fully support.").)

143.   As explained, *supra* ¶ 124, there also is a Delaware limited liability company named "Notarc Global Investments Limited LLC," which was formed on June 3, 2022.  The PH Submission acknowledges that Bowe and Bethel were behind

the creation of this LLC in Delaware, but it also claims that it is not related to Notarc Partners' attempted trade name or the ownership of Notarc Port. (*Id*. at p. 40 n. 7.)

144.   It is not at all clear why Bowe and Bethel created Notarc Global Investments Limited LLC in Delaware within a few weeks after they supposedly attempted to register the trade name "Notarc Global Investments Limited" for Notarc Partners.

145.   This series of highly irregular and suspicious circumstances suggests, at a very minimum, that Bowe, Bethel, and Zhang have been seeking to create confusion regarding the identity of the true beneficial owner(s) of the Panama Project Companies by creating similarly named entities in Delaware and Hong Kong.

146.   More importantly, whether Zhang or Bowe and Bethel eventually own the Panama Project Companies via Notarc Port, it is abundantly clear that they have been working together to steal Plaintiff's assets and maintain and insulate from scrutiny their ill-gotten gains, as discussed further below.

## IV.   THE INDIVIDUAL DEFENDANTS HAVE BEEN WORKING TOGETHER TO PERPETRATE THE THEFT OF PLAINTIFF'S ASSETS

147.   The Notarc Transaction in March 2022 achieved the transfer of complete ownership and control over the Panama Project Companies to Notarc Port, which the Individual Defendants created to serve as the holding company of the

Panama Project Companies in lieu of LHI, which bears Plaintiff's name "Landbridge."

148.    As explained, *supra* ¶¶ 1-3, 13, this was the last step in the multi-year theft scheme that the Individual Defendants have been conspiring on since 2019.

149.    As of 2019, Plaintiff's representatives, including Messrs. Ye Cheng, Li Yejun, and Wang Xiangfeng, were serving on the boards of LHI and the Panama Project Companies.[11]  Zhang at the time was also working for LHI and the Panama Project Companies as representative of Plaintiff's joint venture partner, Mr. Ko.

150.    Zhang at no time held the authority to sell, transfer, or otherwise dispose of the Panama Project Companies or the Project without Plaintiff's consent. Plaintiff never asked Zhang to attempt to sell the Panama Project Companies or the Project.  However, he began covert discussions with Bowe and Bethel in 2019 to "sell" the Panama Project Companies and their assets, including the Project.[12]

151.    Zhang's crony, Han, had also admitted in the Barbados Action that since "the end of 2019 . . . Zhang had been actively trying to sell the Panama

---

[11]    *See supra* ¶¶ 87.

[12]    In its Arbitration Demand, Notarc Port alleges that initial conversations around the sale of the Project to Notarc Port began in 2019.  In fact, neither Notarc Port nor its claimed 100% owner Notarc Partners existed at that time, meaning Bethel and Bowe were discussing the sale of the Project with Zhang. (Ex. 4, ¶ 51.)

Project."  (A true and correct copy of Han's affidavit filed in the Barbados Action is attached as Exhibit 26; *see* ¶ 16.)

152.  Bowe and Bethel must have known that Zhang could not pursue the sale of the Panama Project Companies or the Project, because those assets were majority owned by Plaintiff.  A simple query to Plaintiff by them would have revealed that Plaintiff had no intentions of selling these assets and had never asked or authorized Zhang to attempt to sell them.

153.  Undeterred, from 2019 forward, Zhang, Bowe and Bethel continued working together to achieve the "sale" of the Panama Project Companies – which in reality was just the brazen theft of Plaintiff's assets.

154.  To this end, Zhang, as insider to LHI, first illegally transferred all of Plaintiff's shares in LHI to himself via Sinolam in July 2020, using forged share transfer documents.

155.  Zhang further seized management of the Panama Project Companies, by secretly and illegally removing Plaintiff's appointees from the boards in May 2021 and controlling the Panama Project Companies through his lackeys, Han and Martinez.

156.  Han, in the Barbados Action, admitted that she was made a director of the Panama Project Companies by Zhang and that until the Notarc Transaction in

March 2022, she reported "everything" to Zhang and only acted on Zhang's instruction. (Ex. 26, ¶¶ 23, 30.)

157.    As with Han, Martinez was appointed by Zhang to the boards of the Panama Project Companies – specifically, as Director-President in June 2021. Zhang and Maritnez formed a close relationship with each other, while working together for Mr. Ko in connection with a different project being pursued by Mr. Ko and his corporate entity, Shanghai Gorgeous. Zhang then brought Martinez onto the illicit scheme, by entrusting him with the important role of illegally annulling LHI's voting control over the Panama Project Companies and transferring the same to Coastal Partners, for which Martinez also served as director.

158.    While these illegal machinations were underway, Bowe, Bethel, and Zhang further cemented their partnership by jointly pursuing various business dealings. Among others, on or about February 22, 2021, Zhang appointed Bowe as the attorney-in-fact of Sinolam Smarter Energy LNG Power Co., Inc. ("Sinolam Smarter Energy"), a Panamanian entity that develops a power plant project in Panama. (True and correct copies of Sinolam Smarter Energy's relevant corporate filings with the Public Registry of Panama are attached as Exhibits 54 and 55.) Zhang, at least since 2019, has been serving as CEO of Sinolam Smarter Energy. (*See* Exhibit 56, which was retrieved from

https://www.sec.gov/Archives/edgar/data/1534126/000110465919048565/a19-18181_1ex99d1.htm.)

159.    As explained, *supra* ¶¶ 141-46, Zhang, Bowe, and Bethel were also jointly involved in the formation of Notarc Global Hong Kong in July 2021.  They claim that this entity was set up to pursue business opportunities in Asia that were not related to the Panama Project.  Even accepting this as true, it confirms that Zhang, Bowe, and Bethel essentially acted as a single economic unit pursuing various business undertakings together.

160.    This helps to establish that the Notarc Transaction in March 2022 was *not* a bona fide, arm's length transaction.  The corporate entities involved in the same – that is, the purchasing entity, Notarc Port, and the selling entities, LHI and Coastal Trust  – are all owned and/or controlled by the Individual Defendants who have been working on various business ventures together since at least 2019 and conspiring to divest Plaintiff of its ownership interest in the Panama Project Companies under the false guise of a "sale."  Bowe and Bethel allegedly own Notarc Port; their business partner and co-conspirator, Zhang, wholly owns LHI via Sinolam; and Zhang's crony, Martinez, serves as trustee of Coastal Trust.

161.    Even after the consummation of the Notarc Transaction, the Individual Defendants continue working together on the Panama Project – which further evidences that they acted together with common interest and common purpose in

carrying out the illegal theft of Plaintiff's assets. In particular, Bowe now leads the Panama Project Companies as Director-President, with Martinez serving as Director-Treasurer of the Panama Project Companies. In other words, Martinez, who played a pivotal role in the theft scheme at Zhang's behest, continues working for and on behalf of Notarc Port (which is apparently under Bowe and Bethel's ownership) by serving on the boards of Notarc Port's now wholly-owned subsidiaries, the Panama Project Companies.

162. Also tellingly, for more than a year after the Notarc Transaction, Zhang remained the legal representative of PCCP and CASM, respectively, until May and August 2023, holding the general power of attorney to act on behalf of those companies. Zhang apparently stepped down from this position to hide his continuing relationship with the other Individual Defendants given that Plaintiff was pursuing claims to reverse the illegal transfers in Barbados. (True and correct copies of PCCP's and CASM's filings with the Public Registry of Panama to register the revocation of the power of attorney granted to Zhang are attached as Exhibits 57 and 58.) Zhang nevertheless continues serving as legal representative of UCC. (A true and correct copy of UCC's Corporate Profile, which was retrieved from the Public Registry of Panama, is attached as Exhibit 59.)

163.   As further discussed, *infra* ¶¶ 225-263, the Individual Defendants have also been closely coordinating with one another to sabotage and undermine Plaintiff's efforts to recover its stolen assets.

## V.   UPON LEARNING ABOUT THE NOTARC TRANSACTION, PLAINTIFF SERVES CEASE-AND-DESIST LETTERS ON RELEVANT INDIVIDUALS AND CORPORATE ENTITIES

164.   Upon learning about NMG's supposed acquisition of the Panama Project Companies, Plaintiff acted diligently to uncover the specifics of the theft scheme and to preserve its interest in the Panama Project Companies and the Project.

165.   To that end, Plaintiff obtained corporate records of LHI from the Corporate Affairs and Intellectual Property Office in Barbados (the "CAIPO"). These corporate records showed that Han, as of August 17, 2020, inexplicably became the sole director of LHI in replacement of Mr. Ye (without his knowledge or consent) and the other directors mentioned above. These records also revealed that Sinolam became the sole shareholder of LHI—again without the knowledge or consent of Plaintiff or Mr. Ye. Plaintiff learned through further investigation that Zhang, a former director of LHI, was the sole shareholder of Sinolam.

166.   After conducting its initial investigation—which took several months—and learning these facts, Plaintiff, through its counsel, served cease-and-desist letters on NMG, PCCP, LHI, Sinolam, TIL/MSC, Zhang, and Han, among

others.  (True and correct copies of these letters are attached as Exhibits 18 through 22.)

167.    In its cease-and-desist letters, Plaintiff requested that the relevant parties take no further actions that might infringe upon its rights and interests in LHI, the Panama Project Companies, or the Project. (Exs. 18-22.)  Given that Plaintiff was continuing to investigate the circumstances of the Notarc Transaction, Plaintiff also demanded that relevant parties immediately disclose to Plaintiff any documents and communications relevant to the transfer of the Panama Project Companies to NMG.[13]  (Exs. 18-22.)

168.    Only TIL/MSC responded.   They explained, through counsel, that "MSC and TIL have been led to believe that Notarc has already acquired PCCP and full control of the Project; and TIL is in the process of negotiating the acquisition of an interest from Notarc."  (A true and correct copy of TIL/MSC's response is attached as Exhibit 23.)  TIL/MSC declined to provide any further information to Plaintiff, citing confidentiality obligations associated with its due diligence of the ongoing transaction with NMG.

---

[13]    Plaintiff was not aware of the existence of Notarc Port at the time, and NMG's press release dated May 19, 2022, as well as the PMA's preceding decision of May 16, 2022, led Plaintiff to believe that NMG was the new owner of the Panama Project Companies.

169.   Plaintiff understands that TIL/MSC opted to put on hold or not proceed with its planned acquisition of an interest in the Panama Project, given, *inter alia*, the uncertainty around ownership.

## VI.   PLAINTIFF INITIATES THE BARBADOS ACTION AGAINST SOME OF THE PERPETRATORS OF THE ILLICIT SCHEME

170.   Plaintiff, on February 1, 2023, initiated the Barbados Action in the High Court of Justice of the Supreme Court of Barbados (the "Barbados High Court") to set aside the illegal transfers executed by Zhang and his co-conspirators to divest Plaintiff of its 51% shareholding in LHI.  At the time it initiated this action, Plaintiff was not aware of the full nature of the theft scheme, Zhang's relationship with the other Defendants, or Notarc Port's ownership of the Panama Project Companies.

171.   Zhang, LHI (now solely owned by Zhang), Sinolam, Gorgeous Colon, and Han (who Zhang appointed as the sole director of LHI after becoming its sole owner) are defendants to the Barbados Action.

172.   In their defense, the Barbados Defendants have falsely argued that Plaintiff voluntarily approved the fraudulent transfers that led to the complete divestment of Plaintiff's interest in LHI.  To support this contention, the Barbados Defendants disclosed forged share transfer instruments, which they claim were executed by Plaintiff itself, although they were not.

173.   Specifically, the first share transfer instrument at issue (attached as Exhibit 24) is allegedly executed between Plaintiff and Gorgeous Colon on January 7, 2020.  The Barbados Defendants claims that by means of this instrument Plaintiff had agreed to transfer a 1% holding in LHI to Gorgeous Colon.  The document bears the alleged signatures of Mr. Ye Cheng and Mr. Ko, in their respective capacity as director of Plaintiff and director of Gorgeous Colon (an entity to which Creaton's 49% ownership interest in LHI had previously been transferred in 2018).[14]

174.   However, neither Plaintiff nor Mr. Ye Cheng has ever entered into or signed such an agreement or any other agreement to transfer Plaintiff's shares in LHI to Gorgeous Colon (attached as Exhibit 16 is a true and correct copy of a sworn affidavit of Mr. Ye Cheng filed in the Barbados Action on February 14, 2023.)  The signatures on the agreement for Plaintiff and Mr. Ye Cheng were illegally forged. (Ex. 16.)   Further evidencing the fraudulent nature of the transfer, Zhang replaced Mr. Ko as the sole director of Gorgeous Colon on September 24, 2019, and Zhang obtained the 100% interest in Gorgeous Colon from Mr. Ko on October 14, 2019.

---

[14]   Although not implicating Plaintiff's ownership interest in LHI, the transfer of shares in LHI from Gorgeous Colon to Creaton in 2018 took place without Plaintiff's consent and thus in violation of ████████████████████████ the Framework Agreement.  Gorgeous Colon's transfer of its 49% interest in LHI to Sinolam also violated Barbadian law, which requires director consent for any share transfer.  The validity of the share transfer between Gorgeous Colon and Creaton is being disputed in the Barbados Action.

(A true and correct copy of Gorgeous Colon's Notice of Change of Directors filed with the Companies Registry of Hong Kong on October 11, 2019 is attached as Exhibit 62; a true and correct copy of Gorgeous Colon's 2020 Annual Return filed with the Companies Registry of Hong is attached as Exhibit 63.)  In other words, *Mr. Ko was neither the director nor a stockholder of Gorgeous Colon at the time when this share transfer agreement was supposedly "signed" by him on January 7, 2020.*

175.   The second share transfer instrument (attached as Exhibit 25) produced by the Barbados Defendants was allegedly executed by Plaintiff and Sinolam on July 28, 2020.  By that forged instrument, Plaintiff purportedly agreed to transfer its remaining 50% shareholding interest in LHI to Sinolam.  Plaintiff has never entered into or signed any agreement to transfer its shares in LHI to Sinolam.  The signatures on this second share transfer instrument for Plaintiff and Mr. Ye Cheng were also illegally forged.  Mr. Ye Cheng's alleged signature contained in this document differs on its face from Mr. Ye Cheng's true and original signature.  (Ex. 16 ¶ 8).

176.   The second share transfer instrument also contains a seal from the Panamanian notary public, stating that the notary public has "*compared the signatures above with the one that appears on the signatories' ID and, in our opinion, they look the same, so we consider it authentic.*"  (Ex. 25).  However, Mr. Ye Cheng did not appear, and could not have possibly appeared, before the

Panamanian notary public because he did not leave China at that time (in the middle of the COVID-19 pandemic).  Also, Mr. Ye Cheng did not provide his ID to anyone for the purpose of these illegal transactions, and his ID does not contain any signature against which to compare. (Ex. 16 ¶¶ 11-13).

177.   On the same day, July 28, 2020, Zhang also caused Gorgeous Colon (which was then wholly owned by Zhang) to transfer its 50% ownership interest in LHI to Sinolam (the 49% that it received from Creaton in May 2018, plus the 1% that was fraudulently transferred to it by the forged instrument from Plaintiff on January 7, 2020.)

178.   As a result, Zhang, through Sinolam, became the sole owner of LHI as of July 28, 2020.  The chart below illustrates how Zhang converted Plaintiff's shareholding in LHI and its assets, including the Panama Project Companies and the Project, through these fraudulent share transfers:



179.  A few days later, on August 6, 2020, Zhang, illegally and without Plaintiff's consent, removed all previous directors, including Mr. Ye Cheng, Mr. Li Yejun, and Mr. Ko, from the LHI board.  He then appointed his personal assistant, Han, as the sole director of LHI.  The resignation letter purportedly signed by Mr. Ye Cheng and Mr. Li Yejun were also produced by the Barbados Defendants in the Barbados Action, and they are all forgeries.  Neither man ever saw or signed such a letter.  Tellingly, Han appears as a witness to the first and second share transfer instruments, revealing that she had been involved in Zhang's fraudulent transfer scheme all along and even before Zhang appointed her as the sole director of LHI.

180.  However, in the Barbados Action, Han admitted that she did not witness the signing of these forged share transfer instruments, but rather that they were sent to her by Zhang with instructions for her to notarize them in Panama.  (Ex. 26.)

181.    As explained in the declaration of Ramon O. Alleyne ("Alleyne Decl."), lead counsel for Plaintiff in the Barbados Action, the legality of this series of share transfers and corporate changes surrounding LHI will be adjudicated by the Barbados High Court for purposes of the Barbados Action.  (Alleyne Decl. ¶ 9; *see also* Ex. 2 to Alleyne Decl.)

182.    On March 8, 2023, the Barbados High Court, upon request of Plaintiff, granted an interim injunctive order requiring, *inter alia*, that LHI, its stockholders, directors, and agents refrain from performing or otherwise giving effect to any corporate actions and decision, save for those that are necessary for responding and presenting a defense to Plaintiff's claims in the Barbados Action.  (Ex. 3 to Alleyne Decl.)

183.    The Barbados High Court entered the order against LHI, its stockholders, and those acting as its agents, after duly considering the parties' arguments and evidence regarding the disputed share transfers – and found that there was strong evidence supporting the merits of Plaintiff's claims in the Barbados Action.  Given the urgency of Plaintiff's claims, the Barbados High Court also ordered that the substantive matter be set for trial on an expedited basis. (Ex. 3 to Alleyne Decl.)

184.    But as Plaintiff has learned recently, the Defendants' theft scheme is more intricate and widespread than originally thought.  Zhang illegally seized

ownership and control over LHI, using the forged share transfer instruments, so that he could further pursue the illegal transfer, or "sale" as the Defendants refer to it, of the Panama Project Companies with Bowe and Bethel.

185.   The final illegal transfer that completely alienated the Panama Project Companies from LHI and Plaintiff was implemented, in most part, by the Notarc and Coastal Entities that the Individual Defendants created in Delaware for purposes of carrying out and consummating their theft and conversion scheme.

186.   The Barbados High Court however does not have jurisdiction over the Delaware Entities.  Nor can it determine the validity and legality of Notarc Port and Coastal Partners' alleged ownership of the Panama Project Companies.  (Alleyne Decl. ¶¶ 17-18.)

187.   More importantly, by initiating the Sham Arbitration in Panama to establish Notarc Port as a bona fide purchaser for value of the Panama Project Companies, the Individual Defendants are attempting to undermine any utility that the Barbados High Court's eventual judgment may have for Plaintiff (as well as any utility of this Court's rulings), while perpetuating and attempting to legally insulate their illicit transfers and ownership of these assets.  Again, the Barbados High Court lacks jurisdiction to adjudicate Notarc Port's claimed status as an alleged bona fide purchaser.  (*Id.*)

188.   In order for Plaintiff to fully vindicate its rights to majority ownership of the Panama Project Companies and the Project, Plaintiff requires a determination from this forum on Notarc Port's claimed status as a bona fide purchaser.  While Notarc Port disingenuously claims that the Sham Arbitration it instituted in Panama can serve that role, it is readily apparent that this is not the case.

189.   The Barbados Action is currently underway, and given the Court's order for an expedited trial, the trial will likely be held during the summer of 2024. (Alleyne Decl. ¶ 37.)  It is expected that the Barbados High Court will render an eventual decision on Plaintiff's claims by no later than December 2024.  (*Id.*)

## VII.   BASED ON THEIR ILLEGALLY SEIZED CONTROL OF LHI AND THE PANAMA PROJECT COMPANIES, ZHANG, MARTINEZ, AND THEIR CO-CONSPIRATORS TRANSFER ALL VOTING RIGHTS IN THE PANAMA PROJECT COMPANIES TO COASTAL PARTNERS

190.   Zhang illegally seized ownership and control of LHI by transferring all of Plaintiff's shares in LHI to his wholly-owned Sinolam using forgeries and other fraudulent and illegal means.

191.   As such, as of July 28, 2020, Zhang became the 100% owner of LHI and its wholly-owned Panamanian subsidiaries—that is, the Panama Project Companies—through his company Sinolam.

192.   Almost exactly one month later, on September 1, 2020, the Individual Defendants caused Coastal Partners to be formed in Delaware.  Upon information

and belief, Martinez began serving as director of Coastal Partners upon or shortly after its formation, so that Martinez, in that role, could facilitate the theft scheme.

193.    Upon its formation, Coastal Partners was initially named "Green Ascent Smarter Energy LLC."   The Individual Defendants changed that entity's name to Coastal Partners on June 17, 2021, presumably to hide their affiliation with that LLC.  Zhang owns or is otherwise affiliated with several entities incorporated in various jurisdictions that bear the name "Smarter Energy," such as Sinolam Smarter Energy, which, as explained, *supra* ¶ 158, is an entity in Panama where Zhang and Bowe have been working together at least since February 2021.  (*See* Exs. 54 through 56.)

194.    Thus, removing "Smarter Energy" from the LLC's name and changing it to Coastal Partners was a necessary preparatory step to assist Defendants in concealing their illegal transfers.  The Individual Defendants effectuated this name change so that they could utilize Coastal Partners in their scheme.

195.    The next key step in the plan was for Zhang to seize the management of the Panama Project Companies so as to enable him and co-conspirators, including Bethel and Bowe, to begin the process to illegally transfer these companies and their assets to Notarc Port.

196.    On May 13, 2021, Zhang, using his control over LHI, which held the Panama Project Companies, caused the removal of Plaintiff's representatives from

their positions in and on the boards of the Panama Project Companies.  (A true and correct copy of PCCP's Change of Directors, Members, Registered Agents or Legal Representatives dated May 13, 2021 is attached as Exhibit 28.)[15]

197.   On the same date, Zhang appointed his cousin, Rongchang Zhang, as an interim director of the Panama Project Companies.  (Ex. 28.)

198.   On June 2, 2021, Zhang appointed Martinez as Director-President of the Panama Project Companies.  (True and correct copies of the Panama Project Companies' Change of Directors, Members, Registered Agents or Legal Representatives dated June 2, 2021 are attached as Exhibits 29, 60 and 61).  At the time, Han was also serving as Director-Secretary of the Panama Project Companies.

199.   Zhang and his co-conspirators then caused all four of the Panama Project Companies to hold stockholder's meetings on July 1, 2021 (the "July 1, 2021 Stockholder Meetings"), over which Martinez and Han presided.  (True and correct copies of the Minutes of the July 1, 2021 Stockholder Meetings are attached as Exhibits 30 through 32.)

200.   These July 1, 2021 Stockholder Meetings were the lynchpin in further dissipating Plaintiff's ownership interests in the Panama Project Companies. Through the July 1, 2021 Stockholder Meetings, Zhang and Martinez (along with

---

[15]   Plaintiff's representatives were removed from the boards of UCC and CASM as well on May 13, 2021.

Han) *annulled all of the shares that LHI held* in the Panama Project Companies – which until then represented 100% of the capital stock of the Panama Project Companies. In parallel, they caused the Panama Project Companies to issue new shares, divided into Class A shares (a class of non-voting shares) and Class B shares (a class of shares with exclusive voting rights). (Exs. 30 through 32.)

201. Zhang and his co-conspirators illegally transferred to Coastal Partners (of which Martinez served as director), which was then owned by Coastal Trust (of which Martinez also served as trustee), all of the Class B shares—specifically, 6 Class B shares of PCCP, 30 Class B shares of UCC, 4 Class B shares of CASM, and 4 Class B shares of IMD. Coastal Partners continues to hold these Class B shares in the Panama Project Companies to date.

202. Zhang, Martinez and their co-conspirators caused the Panama Project Companies to issue to LHI only new Class A, non-voting shares, consisting of 49 Class A shares in PCCP, 250 Class A shares in UCC, 36 Class A shares in CASM, and 30 Class A shares in IMD.

203. Therefore, as of July 1, 2021, LHI ceased to be a 100% stockholder of the Panama Project Companies. Coastal Partners became the holder of the new Class B shares with exclusive voting rights, whereas LHI's stockholdings became limited to the new Class A non-voting shares, as illustrated in the chart below:



204.   Zhang, Martinez and their co-conspirators thus used the shares in LHI that were stolen from Plaintiff to transfer exclusive voting rights in the Panama Project Companies to Coastal Partners (and thus to Zhang's and Martinez' trust in Delaware).

205.   Plaintiff, by virtue of being a rightful 51% stockholder in LHI and based on the Framework Agreement (Ex. 8) ███████████████████████████ ██ was entitled to manage the Panama Project Companies and was further entitled to know about and consent, or not, to any such share transfers.  But Plaintiff was not consulted on, and it did not consent to, the annulment of its original shares or the issuance of the new shares, including to Coastal Partners.  Nor would it have agreed to consent to this annulment had it been notified.

206.   Importantly, the Panama Project Companies did not register the minutes of the July 1, 2021 Stockholder Meetings before the Public Registry of Panama until April 2022.  (Ex. 30 through 32.)  This reveals the extent to which the Individual Defendants sought to hide their theft scheme from Plaintiff until they consummated the Notarc Transaction in March 2022.

## VIII. THE INDIVIDUAL DEFENDANTS ORGANIZE THE NOTARC TRANSACTION TO PERFECT THEIR ILLEGAL AND FRAUDULENT SCHEME USING NOTARC PORT

207.   Once Coastal Partners became a stockholder with exclusive voting rights in the Panama Project Companies, the Individual Defendants soon began implementing the last steps in their illicit transfer scheme, which consisted of consolidating 100% of stock in the Panama Project Companies under Notarc Port, which the co-conspirators sought to disguise as a bona fide purchaser.

208.   First, on September 30, 2021, Bethel and Bowe, conspiring with Zhang and Martinez, incorporated Notarc Partners in Delaware.[16]  According to the PH Submission, Bethel and Bowe have each owned 50% of membership interest of Notarc Partners since its formation.

---

[16]   Notarc Partners' Certificate of Formation dated September 30, 2021 is included in the PH Submission.  (*See* Ex. 3, at p. 53.)

209.   Then, on November 18, 2021, Bethel and Bowe, conspiring with Zhang and Martinez, presumably incorporated Notarc Port in Delaware.[17]   As explained, *supra* ¶¶ 122-46, there remains a legitimate question of who eventually owns Notarc Port.  Zhang has claimed in the Barbados Action that Bethel and Bowe own Notarc Port through their ownership of Notarc Partners.  Whether it be Bowe and Bethel (via their Notarc Partners) or Zhang (via his Notarc Global Hong Kong), it is undeniable that each of the Individual Defendants was either directly involved in or was aware of the formation of Notarc Port, as they conspired together and caused that entity to be formed for the express purpose of furthering their illegal transfer scheme, which culminated in the transfer of all of Plaintiff's interest in the Panama Project to Notarc Port.

210.   Then on January 13, 2022, Zhang, acting as Ad-Hoc President (in the absence of the incumbent, Martinez), convened extraordinary stockholder meetings for the Panama Project Companies.  (*See* Ex. 16, at pp. 58-61.)  By these meetings, Zhang caused the Panama Project Companies to appoint ACON LAW as a new registered agent, replacing the previous registered agent who had served as such for the Panama Project Companies since 2015.  A registered agent's responsibilities include, among others, keeping and maintaining a stock register.  ACON LAW is a

---

[17]   Notarc Port' Certificate of Formation dated November 18, 2021 is included in the PH Submission.  (*See* Ex. 3, at p. 49.)

Panamanian law firm led by Xiu Gao, who has been working closely with and for Zhang at least since 2016. ACON LAW also has been serving as the registered agent of Notarc Energy Development, Inc. – another "Notarc" entity incorporated in Panama whose President is Bowe – since January 2022.

211. In March 2022, the Individual Defendants, all conspiring together, executed the Notarc Transaction that allowed Notarc Port to illegally acquire directly and indirectly 100% of the shares in the Panama Project Companies. As a result, Notarc Port (which Bowe and Bethel supposedly own via Notarc Partners) replaced LHI as the holding company of the Panama Project Companies.

212. The chart below illustrates the structure of the Notarc Transaction:



213. The first component of the Notarc Transaction was the Sale and Purchase Agreement executed between LHI and Notarc Port on March 22, 2022.

Through this agreement, Notarc Port purchased all of LHI's Class A, non-voting shares in the Panama Project Companies (namely, 49 Class A shares in PCCP, 250 Class A shares in UCC, 36 Class A shares in CASM, and 30 Class A shares in IMD) for the sum of $80,303 (the "LHI Transaction"). Han executed this Sale and Purchase Agreement on LHI's behalf, acting as sole director of LHI.

214.   The second component of the Notarc Transaction involved the sale of a 100% membership interest in Coastal Partners from Coastal Trust to Notarc Port (the "Coastal Transaction"). Specifically, through the Sale and Purchase Agreement entered into between Coastal Trust and Notarc Port on March 22, 2022, Coastal Trust agreed to sell its 100% membership interest in Coastal Partners to Notarc Port for the shockingly low and irrelevant sum of $1.

215.   Considering that Coastal Partners then held all Class B voting shares in the Panama Project Companies, the nominal consideration of $1 disproves any suggestion that Coastal Trust was acting as an independent third party to the Notarc Transaction. It also strains credulity that Martinez, acting as trustee of Coastal Trust, decided to sell the trust's very valuable assets to Notarc Port for $1 without Zhang's, Bowe's and Bethel's direction and instruction. Zhang in fact had admitted in the Barbados Action that he led the Notarc Transaction, leaving no doubt that Coastal Trust and Martinez were acting at Zhang's behest, and in conjunction with Bowe and

Bethel.  (A true and correct copy of Zhang's affidavit filed in the Barbados Action on April 27, 2023 is attached as Exhibit 36.)

216.   Han had also admitted in the Barbados Action that Zhang was entirely responsible for the Notarc Transaction, by stating in her affidavit that "[a]fter Mr. Zhang completed the negotiations with Notarc, he instructed me to sign the transaction document as director in both LHI and PCCP."  (Ex. 26, ¶ 30.)

217.   In addition to acquiring shares in the Panama Project Companies through the LHI Transaction and the Coastal Transaction, Notarc Port was also issued new Class B shares (with voting rights) by the Panama Project Companies. This issuance of new Class B shares was effectuated through an agreement executed by Bowe (on behalf of Notarc Port as its director), Han (on behalf of the Panama Project Companies as their legal representative and further on behalf of LHI as its sole director) and Martinez (on behalf of Coastal Partners as its director) on March 21, 2022 (the "Share Subscription Agreement").

218.   Section 9.12 of this Share Subscription Agreement contains an arbitration agreement, which forms the basis of the Sham Arbitration in Panama.

219.   Then, pursuant to the Share Subscription Agreement, the Panama Project Companies held stockholders' meetings the next day on March 22, 2022 (the "March 22, 2022 Stockholder Meetings," whose minutes are attached as Exhibits 37 through 39).   Martinez, acting as Director-President of the Panama Project

Companies, chaired the March 22, 2022 Stockholder Meetings. At these meetings, the Panama Project Companies issued 500 new Class B shares in PCCP, 2,820 new Class B shares in UCC, 400 new Class B shares in CASM, and 340 new Class B shares in IMD *all to Notarc Port*. (Exs. 37-39.) Notarc Port claims that it acquired these shares for $938,356.

220. In the March 22, 2022 Stockholder Meetings chaired by Martinez, Bowe was appointed as new Director-President of the Panama Project Companies, replacing Martinez. (Exs. 37-39.) Although being replaced by Bowe, Martinez immediately assumed the position of Director-Treasurer of the Panama Project Companies, thus continuing to work for Bowe (new Director-President) and Notarc Port (new owner of the Panama Project Companies). (Exs. 37-39.)

221. As a result of the Notarc Transaction, Notarc Port now stands in the place of LHI, holding 100% of the shares in the Panama Project Companies, as represented in the chart below:



222. After the Individual Defendants caused LHI to be removed entirely from the Panama Project Companies' chain of ownership through the Notarc Transaction, they launched a multi-jurisdictional campaign to conceal their illegal and fraudulent transfers and make themselves judgment proof by seeking to dissolve the instruments they used as "sellers" in their fraud—LHI, Sinolam, and Gorgeous Colon.

223. In particular, Zhang, through Sinolam, instructed and authorized Han to apply for the dissolution of LHI on June 6, 2022. (A true and correct copy of LHI's Statement of Intent to Dissolve is attached as Exhibit 48.) Zhang then applied for the deregistration of Gorgeous Colon from the Companies Registry of Hong Kong on November 24, 2022. Sinolam, acting at Zhang's behest, also applied to strike off its name from the Singaporean Register of Companies on January 16, 2023.

224.   This campaign by Zhang and his co-conspirators to remove the traces of their illegalities only came to a halt because Plaintiff opposed it before the relevant authorities in Barbados, Hong Kong, and Singapore.

## IX.   THE CO-CONSPIRATORS INITIATE HARASSING AND RETALIATORY CRIMINAL PROCEEDINGS IN PANAMA AGAINST PLAINTIFF AND ITS COUNSEL

225.   The co-conspirators' machinations to insulate themselves from the multi-year theft scheme escalated after Plaintiff began the Barbados Action.

226.   First, on February 15, 2023, Bowe, acting as the legal representative of NMG Latin America, lodged a criminal complaint (Ex. 40) against David M. Orta, Lucas Loviscek, and Haiyan Tang, who are partners at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP and counsel to Plaintiff and Landbridge Group in relation to the issues emanating from Defendants' illegal transfer scheme.

227.   The criminal complaint astonishingly alleges that the cease-and-desist letter Plaintiff served on NMG (a Bahamian entity) constitutes a crime of extortion that allegedly caused damages to NMG Latin America in the amount of $200 million. (Ex. 40 at p. 6).

228.   Plaintiff first learned of this criminal complaint when Zhang, on behalf of LHI, filed a copy of the complaint in the Barbados Action on April 27, 2023 in response to Plaintiff's claims in that action.  Panamanian criminal complaints in the investigation phase are confidential and only available to the parties to the criminal

proceeding or their counsel. As such, Zhang could only have accessed NMG Latin America's criminal complaint by receiving it from NMG Latin America, of which Bowe and Bethel are directors.

229. As explained, *supra* ¶¶ 114-15, NMG Latin America's criminal complaint also fueled the Individual Defendants' misinformation campaign intended to hide the true owner of the Panama Project Companies, given that it alleges in the complaint to be the owner of these companies when Notarc Port is the true, current owner.

230. Then on April 14, 2023, PCCP filed a criminal complaint (attached as Exhibit 41) against Plaintiff, Landbridge Group, Mr. Ye Cheng, the EPC contractor for the Panama Project, and other third parties, alleging that these entities and individuals have committed the crimes of extortion and economic fraud.

231. As with NMG Latin America's criminal complaint, Plaintiff became aware of the existence of PCCP's criminal complaint when Zhang filed it in the Barbados Action on April 27, 2023. Importantly, at the time, Zhang was still serving as legal representative of PCCP vested with a general power of attorney for the company. And the board of PCCP was (and still is) controlled by Bowe and Martinez. Thus, there is no doubt that the Individual Defendants caused PCCP to file this additional baseless criminal complaint. In the complaint, PCCP also

disingenuously proposed that the Panamanian prosecutor to conduct an interview with Zhang, as he would attest to the alleged crimes.

232.   Both criminal complaints filed by NMG Latin America and PCCP are frivolous and retaliatory.  Tellingly, these criminal complaints were both filed soon after Plaintiff initiated the Barbados Action; and Zhang is using them to support his defense in that action.  This again demonstrates the very close coordination between the Individual Defendants to work against Plaintiff's legitimate efforts to regain its ownership and control over the Panama Project Companies and the Project.

233.   Further, as a result of the criminal complaints, Plaintiff (even if it were willing to do so, which it is not) could not feasibly participate in the Sham Arbitration or any other Panamanian judicial proceeding for fear of being subject to criminal liability and potential arrest in the country.

## X.   THE CO-CONSPIRATORS INSTITUTE THE SHAM ARBITRATION IN PANAMA TO LEGITIMIZE NOTARC PORT'S ILLEGAL PURCHASE OF THE PANAMA PROJECT AND COVER UP THEIR CONVERSION AND CONTINUED UNJUST ENRICHMENT

234.   In furtherance of their coordinated efforts to avoid accountability and attempt to legitimize their fraudulent transactions, Defendants instituted the Sham Arbitration in Panama in the fall of 2023.

235.   As background, shortly before the commencement of the Sham Arbitration, Paul Hastings invited Plaintiff's counsel to discuss a potential resolution

of the dispute.  On August 21, 2023, Plaintiff refused this offer.  (A true and correct copy of email communications between Plaintiff's counsel and Paul Hastings is attached as Exhibit 43.)

236.  Then on September 26, 2023, Notarc Port, along with the Panama Project Companies and Coastal Partners, filed an Arbitration Demand (Ex. 4) against LHI and Coastal Trust before the CeCAP (Center of Conciliation and Arbitration of Panama), requesting that the arbitral tribunal issue an award declaring that (i) the transaction agreements through which Notarc Port acquired the Panama Project Companies and the Project are valid and enforceable; and (ii) Notarc Port's purchase of the Panama Project Companies was bona fide and valid.

237.  On October 12, 2023, Notarc Port amended its arbitration demand (the "Amended Arbitration Demand") to comply with certain formalities and procedural requirements of the CeCAP, but the relief sought remained unchanged.  (A true and correct copy of Amended Arbitration Demand is attached as Exhibit 44.)

238.  As Plaintiff has outlined above, the Individual Defendants own or otherwise control every party involved in the Sham Arbitration.  Bethel and Bowe are the claimed beneficial owners of (1) all claimants, Notarc Port and its subsidiaries, Coastal Partners and the Panama Project Companies, through Notarc Partners.  Zhang is the beneficial owner of (2) respondent LHI, through Sinolam.  Martinez serves as trustee and legal representative of (3) respondent Coastal Trust.

239.   Therefore, all parties to the Sham Arbitration – who partook in the illegal Notarc Transaction in March 2022 – are acting at the behest of the Individual Defendants who have been working together to carry out and perfect their theft of Plaintiff's assets, as illustrated in the chart below:



240.   The purpose of the Sham Arbitration is two-fold.  First, the Individual Defendants who wholly own or otherwise control all claimants and respondents seek to use that proceeding to legitimize their years-long fraudulent scheme and their illegitimate ownership and management of the Panama Project Companies and the Project.   Second, the Sham Arbitration also serves as a way for the Individual Defendants to undermine the Barbados Action and its eventual ruling in relation to the legitimate ownership of LHI and the reversal of the actions taken by Zhang and his co-conspirators after he (and they) took illegal control of that company.

81

241.    In light of this, there can be no real question about the illegitimate nature of the Panama Arbitration.

242.    Indeed, per Zhang's own admission in his recently filed affidavit to the Barbados Action, the Arbitration will be no more than an echo chamber where the aligned parties would only seek to vouch for the validity and legality of the Notarc Transaction: in his recent affidavit, Zhang claims:

> Notarc expressed interest in  and eventually purchased the project. ***The sale to Notarc was a bona fide, arm's length transaction. Notarc paid valuable consideration for the Panama Project Companies following a lengthy due diligence process by Notarc***.

(Ex. 3, ¶ 23 (emphasis added).)

243.    This exactly tracks Notarc Port's contentions in the Sham Arbitration; and being the sole stockholder, Zhang will undoubtedly dictate LHI's response in the Sham Arbitration, which as can be seen is an acquiescence to the claims.[18]

244.    Likewise, Martinez, serving as trustee and legal representative of Coastal Trust, will surely *not contest* Notarc Port's bona fide purchaser claim. Martinez himself was one of the key perpetrators of the theft scheme, and he now

---

[18]    Given the Barbados High Court's injunctive order entered against LHI on March 8, 2023 (the "March 8 Order"), which prevents LHI from taking any corporate action or decision during the pendency of the Barbados Action, LHI requested that the Barbados High Court vary the March 8 Order to allow its participation in the Sham Arbitration. Zhang's recent affidavit was field in this context.  LHI's request is still pending before the Barbados High Court.

works for Bowe and Notarc Port by serving as Director-Treasurer of the Panama Project Companies.

245.   The Sham Arbitration is thus designed and pre-disposed by Zhang, Bethel, Bowe, Martinez and their other co-conspirators to render the desired outcome of insulating their illegal actions.  Plaintiff therefore has no reason to involve itself in the proceeding, even to defend its interests, as it is designed to ensure that all the odds are fully stacked against Plaintiff.  Plaintiff's participation in the proceeding would only serve to legitimize its pre-ordained, illegitimate outcome.

246.   As explained in the accompanying declaration of Eric Britton of Britton & Iglesias, Attorneys at Law ("Britton Decl.," Exhibit 27), the parties to the Sham Arbitration are likely to proceed expeditiously with the case.  They can obtain the award they desire within much less than a year given that the respondents will not contest the claims advanced by the claimants, and they can agree to proceed with the Sham Arbitration on an expedited schedule.  (Britton Decl. ¶¶ 14-16.)  In fact, the Panama Arbitration Law and CeCAP Rules both allow the arbitral tribunal to issue an award by mere agreement of the parties, which could take less than 2 months. (Britton Decl. ¶¶ 15-17.)

247.  As will be explored below, once the desired award is obtained, Defendants will surely use it to prevent Plaintiff from seeking judicial relief in any forum – including before this Court – as is their admitted goal.  (Ex. 1).

83

248.  Moreover, Defendants had already begun engaging with third parties, including TIL/MSC, to sell off or otherwise encumber the Panama Project Companies.  They will undoubtedly use the award that they seek to procure via the Sham Arbitration to further such efforts.

249.  In particular, once the desired award is obtained, Defendants can seek to have it recognized and confirmed as a valid and enforceable judgment in Panama, which will very likely occur as no parties to the Sham Arbitration have an incentive to challenge the recognition and confirmation of the award.  (Britton Decl. ¶¶ 69-70.)  Panamanian Arbitration Law establishes that national awards are recognized and directly executable.  (*Id*.)

250.  Separately, given that the Panama Project Companies themselves are the parties to the Sham Arbitration, they can issue a corporate certification transcribing the award or a portion thereof (for example, the disposition declaring Notarc Port as a bona fide purchaser of the companies) and register such a certification in the Public Registry of Panama.  (Britton Decl. ¶ 61.)  Once the registration is complete, the award or portion thereof will serve as "public evidence" of Notarc Port's status as a bona fide purchaser of the Panama Project Companies, vis-à-vis any third party to whom Defendants may sell or transfer an interest in the Panama Project Companies.  (Britton Decl. ¶ 62.)

251.   Any of these routes will cause irreparable harm to Plaintiff, as any third party that relies on the award procured by the Sham Arbitration to acquire an interest in the Panama Project Companies from Defendants will be protected under Panamanian law as a bona fide purchaser.  (Britton Decl. ¶¶ 63-64.)  This will very likely inhibit any efforts by Plaintiff to reclaim its ownership interest in the Panama Project Companies.  (Britton Decl.  ¶ 64.)

## XI.   NOTARC PORT THREATENS TO JOIN PLAINTIFF TO THE SHAM ARBITRATION, WHILE ALSO REVEALING ITS MALICIOUS GOAL TO STRIP PLAINTIFF'S RIGHT TO JUDICIAL RESOLUTION AND AVOID THE CONSEQUENCES OF AN ADVERSE JUDICIAL RULING

252.   The Sham Arbitration is based on the arbitration agreement contained in the Share Subscription Agreement executed by Bowe (on behalf of Notarc Port), Han (on behalf of LHI and the Panama Project Companies), and Martinez (on behalf of Coastal Partners) – on March 21, 2022.  Plaintiff is not a party to that agreement, which is part of the illegal conspiracy, theft, and conversion carried out by Defendants.

253.   Plaintiff has no obligation to and cannot be compelled to join the Sham Arbitration because it has not signed any arbitration agreement with Defendants or with any of the named parties to the Sham Arbitration.  Nor does Plaintiff have any incentive to participate in the Sham Arbitration that is entirely designed and structured by Defendants to ensure Notarc Port's victory.

254.    According to the arbitration agreement, to which Plaintiff is not a party, the named parties each appoint one arbitrator.  (Ex. 4 ¶ 37.)  Those two arbitrators then appoint the final member of the three-person panel.  Under this configuration, Plaintiff would have no say in the selection of any arbitrator, and the co-conspirators would effectively be able to select all three.

255.    Moreover, the Individual Defendants and Sinolam  are not parties to the Share Subscription Agreement or to the Sham Arbitration.  As a result, the arbitral panel will not consider their misconduct that took place prior to the Notarc Transaction, again leaving Plaintiff without any true recourse in the Sham Arbitration.

256.    Notwithstanding all this, Notarc Port has improperly demanded Plaintiff's joinder to the Sham Arbitration with an escalating threat to use the result in the Sham Arbitration to squash any attempt by Plaintiff to regain its illegally taken assets.

257.    On October 31, 2023, Notarc Port, in sending its Amended Arbitration Demand to Plaintiff, insisted that the Sham Arbitration be the exclusive forum for determining ownership of the Panama Project Companies and the Panama Project, stating that regardless of Plaintiff's participation in the same, it will seek to use it to "*estop*" Plaintiff "*from asserting its rights in Panama and in other fora to the maximum extent permitted by applicable law*."  (Ex. 1.)

258.   Plaintiff, through its reply letter to Notarc Port dated November 15, 2023 (attached as Exhibit 46), declined Notarc Port's "invitation" because the Sham Arbitration is "an illegitimate proceeding initiated by and against related and interested parties in an effort to produce an arbitral award to attempt to legitimize an ongoing scheme of fraud [...]."  (Ex. 46.)

259.   In its letter to Notarc Port, Plaintiff also demanded that Notarc Port cease the Sham Arbitration, while also explicitly stating that Plaintiff "will continue to pursue its claims and available remedies against the perpetrators of the fraudulent scheme, including Notarc [Port], before the competent courts of law and equity." (*Id.*)

260.   Notarc Port did not provide its response to Plaintiff's letter; nor did it cease the Sham Arbitration as requested by Plaintiff.  In fact, the named parties to the Sham Arbitration have demonstrated an escalated willingness to push forward with the Sham Arbitration by applying to the Barbados High Court to modify its injunctive order to allow LHI's participation in the Sham Arbitration so that the proceeding can move forward as originally envisioned.

261.   Nor can Plaintiff potentially resort to the courts in Panama to enjoin Defendants from continuing the Sham Arbitration.  As an initial matter, Plaintiff is under no obligation to resort to the courts in Panama – and doing so would place

Plaintiff and its counsel at the risk of criminal prosecution given the ongoing criminal proceedings there initiated by Defendants.

262.  In any event, Plaintiff understands that it is ***very unlikely*** that the courts in Panama will enjoin the Sham Arbitration upon Plaintiff's request, given that Plaintiff is not a party to the Sham Arbitration; and the courts in Panama will likely consider that the Sham Arbitration is properly constituted based on a valid arbitration agreement entered amongst the named parties to that proceeding.  (Britton Decl. ¶ 43.)

263.  Panamanian law also requires a party seeking a preliminary injunction to present a complaint for underlying claims to accompany the injunctive request. Hence, seeking to enjoin the Sham Arbitration through the courts in Panama will require Plaintiff to seek an adjudication of Notarc Port's claimed status as a bona fide purchaser before the courts in Panama.  (*Id.*)  It will likely take over ten years for the courts in Panama to render a final determination on Notarc Port's claimed status as a bona fide purchaser. (*Id.* ¶ 56.)[19]  Again, Plaintiff has no obligation to take this onerous and thorny path, as Notarc Port is at home here in Delaware (so are the Coastal Entities).  Additionally, given the likely inability to enjoin the Sham

---

[19]  It is also questionable that the courts in Panama will have jurisdiction over Notarc Port, given its incorporation in Delaware and the absence of a known registered office of Notarc Port in Panama.  (Britton Decl. ¶¶ 44-47.)

Arbitration via a request to do so in the Panama courts, it would in any event be futile to file such a claim there.

## XII.  NOTARC PORT IS NOT A BONA FIDE PURCHASER OF THE PANAMA PROJECT COMPANIES

264.   Notarc Port cannot be a bona fide purchaser of the Panama Project Companies, because the Individual Defendants, who are the very co-conspirators in the multi-year, illegal scheme to perpetrate the conversion of Plaintiff's assets, own or otherwise control all the entities involved in the Notarc Transaction, as discussed *supra* ¶¶ 207-12.

265.   This means that all knowledge of the Individual Defendants' wrongdoings leading up to the transfer to Notarc Port – including the forgeries of LHI's share transfer instruments and the annulment of LHI's voting control over the Panama Project Companies – is directly known by and/or imputed to Notarc Port, destroying any claim it might have had to status as a good faith purchaser without notice.

266.   The absurdity of Notarc Port's claim to be a bona fide purchaser is better understood by recognizing that the Sham Arbitration is itself *a further fraudulent step* in Defendants' efforts to conceal their scheme and maintain illegitimate ownership of the Panama Project Companies and the Project.

267.   In its Arbitration Demand, Notarc Port falsely alleges that Plaintiff's claim of majority ownership in the Panama Project Companies and the Panama Project is specious and false, because it is "directly inconsistent" with LHI and Coastal Trust's representations to Notarc Port.   (Ex. 4, ¶ 73.)  The representations that Notarc Port claims to rely on came from Zhang, who at the time of the Notarc Transaction had already illegally taken control over LHI and the Panama Project Companies, as Notarc Port even admits in its Arbitration Demand that Zhang represented the seller side in the Notarc Transaction.  (*Id*. at ¶ 27.)

268.   Notarc Port also claims in the Arbitration Demand that its "[w]itnesses will testify that Notarc's advisors conducted due diligence into LHI [*i.e.*, LHI], the Panama Group Companies, and the Panama Canal Project."  (*Id*. at ¶ 55.)  This too is no more than a smokescreen: however Defendants orchestrated the supposed due diligence, they cannot hide from the fact that Bethel and Bowe (assuming they – instead of Zhang – own Notarc Port) ***were fully aware*** of Zhang's illegal machinations, nullifying any claim that Notarc Port could be a bona fide purchaser without notice.  It is telling that Notarc only offers testimony of its purported "advisors"—not the actual underlying due diligence documents—to support its spurious claims in the Sham Arbitration.

269.   In any event, even if the facts were as Notarc Port represents them—and they are not, as shown by the evidence that Plaintiff has gathered—a prospective

buyer acting at arm's length in good faith would and should have inquired into the basis of Zhang's claimed ownership of LHI, the Panama Project Companies and the Panama Project, as well as what happened to Plaintiff's and Mr. Ko and his companies' prior ownership, particularly since Zhang's discussions with Bowe and Bethel to sell them these assets began in 2019 when Defendants concede ownership rested with Plaintiff and Mr. Ko.

270.   At that point, the public records showed that Plaintiff's representatives Messrs. Ye Cheng, Li Yejun, and Wang Xiangfeng were the sitting directors of LHI and/or the Panama Project Companies.  PCCP's website clearly listed Landbridge as a joint owner and developer of the Panama Project.  (Attached as Exhibit 49 is a true and correct copy of PCCP's ("PCCP") webpage entitled "Home / ¿Quiénes Somos?  /  PCCP"  which  was  retrieved  from  URL http://www.pccp.com.pa/pccp/index.php/quienes-somos/pccp#.)

271.   Additionally, in light of the size and strategic importance of the Panama Project, Landbridge's ownership and participation in the Panama Project was a widely publicized fact.

272.   And yet, NMG, Bowe, Bethel, or Notarc Port never contacted Plaintiff or its parent company, Landbridge Group, to inquire about its ownership over and rights to the LHI, the Panama Project Companies or the Panama Project.  Hence, Notarc Port, on its best case, proceeded with the Notarc Transaction based on

91

Zhang's representations without even checking with Plaintiff and its representatives about the claims of ownership being made by Zhang. Any reasonable degree of due diligence would have revealed the baseless nature of Zhang's supposed claims, and that Plaintiff never approved or consented to transfer its ownership interest in LHI and the Panama Project Companies to anyone, and received no consideration whatsoever for the fraudulent transfers.

273.   Equally tellingly, Notarc Port does not claim in the Arbitration Demand that it conducted due diligence on the Coastal Entities, despite that those entities controlled all voting rights in the Panama Project Companies.[20] This omission speaks volumes, because any reasonable commercial party would have enquired into why the exclusive voting rights were transferred from LHI to the Coastal Entities and for what consideration. This inquiry would have alerted any would-be buyer that something was very suspicious with the seller's representations.

274.   In the Arbitration Demand, Notarc Port also emphasizes that it paid valuable consideration. However, Notarc Port, by its own account, only paid one dollar to acquire Coastal Partners from Coastal Trust. So, for effectively ***no consideration at all***, Notarc Port acquired the full voting rights in the Panama Project Companies. Hard to imagine a flag more red than that one.

---

[20]   Nor did Notarc Port produce a single document relating to Coastal Trust.

275.  Notarc Port also allegedly paid $80,303 to LHI to acquire the latter's shares (then comprising only of non-voting shares) in the Panama Project Companies.  LHI's shares, combined with Coastal Partner's shares, represented 100% of ownership interest and voting rights in the Panama Project Companies. Notarc Port, per its own contention, directly and indirectly acquired 100% ownership and control of the Panama Project Companies, for a meager sum of at most ***$80,304 when the Panama Project, one of the assets of these companies, is an immensely valuable concession***.

276.  Notarc Port also claims that the alleged payment it made to the Panama Project Companies in the amount of $938,356 to subscribe to new voting shares issued by the Panama Project Companies through the March 22, 2022 Stockholder Meetings should count as a payment of a bona fide value.  This position strains credibility.  If such a payment was ever made—and it is not clear that it was, as the payment was essentially an intercompany transaction between Notarc Port and its now wholly-owned subsidiaries—that cannot serve as valid consideration exchanged for the purchase of the Panama Project Companies.  This would have been the consideration paid ***for the issuance of new shares*** in these companies.

277.  In any event, even accounting for the alleged payment to the Panama Project Companies in the amount of $938,356, Notarc Port alleged consideration

represents an infinitesimal fraction of the value of the Panama Project Companies and the hundreds of millions of dollars that had already been invested into them.

278.    Presumably recognizing this, Notarc Port claims that it also accepted the assignment of "the substantial outstanding debt" initially owed by the Panama Project Companies to a Barbados entity named Gorgeous International Inc. (in the amount more than $230 million) and to Coastal Partners (in the amount of $3.48 million):

| Original Debtor | New Debtor | Creditor | Loan Amount |
|---|---|---|---|
| PCCP | Notarc | Gorgeous International Inc. | US$191,585,702.85 |
| PCCP | Notarc | Coastal Infrastructure Partners LLC | US$3,488,152.78 |
| UCC | Notarc | Gorgeous International Inc. | US$15,625,972 |
| CASM | Notarc | Gorgeous International Inc. | US$29,133,889 |

(Ex. 4, ¶¶ 60(f), 61.)

279.    Not surprisingly, Notarc Port's Arbitration Demand contains *no* information whatsoever regarding when the Panama Project Companies incurred these alleged debts, whether these are real or only paper debts, or for what purposes the debts were incurred.

280.    Moreover, Gorgeous International was a Barbados entity of which Zhang was the sole shareholder and which Zhang had already dissolved in

September 2020 – a year and a half before the Notarc Transaction.  (*See* Ex. 2.) Notarc Port still executed the loan assignment with that already dissolved entity in March 2022 to assume the Panama Project Companies' obligation to repay over $230 million.

281.   This ostensibly irregular arrangement between Notarc Port and Gorgeous International speaks for the evident dubious nature of the Notarc Transaction.  Again, a high-flying red flag.  Indeed, as explained, *supra* ¶¶ 36-60, when dissolving Gorgeous International, Zhang made that $230 million loan amount payable to himself directly as the former sole shareholder of Gorgeous International. (*See* Ex. 2 at p. 11.)  This further means that despite the apparent transfer of ownership over the Panama Project Companies to Bowe and Bethel via Notarc Port, Zhang is still positioned to recover hundreds of millions of dollars from Notarc Port, which was able to obtain the Panama Project Companies for a fraction of what they are worth.

282.   Given the foregoing facts, Notarc Port's self-serving contention that it is a bona fide purchaser for good value of the Panama Project Companies and the Panama Project is necessarily defeated.

## FIRST CAUSE OF ACTION
### (Unjust Enrichment Under Delaware Law)
### (Against All Defendants)

283.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

284.   Based on the conduct alleged in this Complaint, Defendants unjustly enriched themselves at the direct expense of Plaintiff.

285.   Defendants were unjustly enriched by the illegal receipt of Plaintiff's shares in LHI and the Panama Project Companies.

286.   Defendants were further unjustly enriched by the retention of all economic benefits derived from LHI, the Panama Project Companies, and the Project.

287.   Plaintiff was impoverished by being deprived of its majority ownership interests in LHI, the Panama Project Companies, and the Project, without any compensation or remuneration for Plaintiff.

288.   Plaintiff was further impoverished by Defendants' retention of all economic benefits derived from LHI, the Panama Project Companies, and the Project.

289.   Plaintiff's impoverishment, as described, was directly related to Defendants' enrichment because Defendants' illegitimate ownership of LHI, the Panama Project Companies, and the Project, as well as any economic benefit and

other attendant rights derived from the same, is a direct and proximate result of the Defendants' illegal theft scheme.

290.   Defendants' enrichment at Plaintiff's expense was wholly without justification because they obtained ownership of LHI, the Panama Project Companies, and the Project illegally and through a series of unauthorized, illegal and fraudulent transfers and transactions that Zhang, Martinez, Bowe and Bethel carried out using the entities they own or otherwise control to steal Plaintiff's assets.

291.   Defendants thus have been unjustly enriched to Plaintiff's detriment, through their unlawful transfer and retention of Plaintiff's illegally divested ownership and economic interests and other attendant rights in LHI, the Panama Project Companies, and the Panama Project.

292.   Plaintiff, who has suffered a great detriment at the direct expense of Defendants' unjust enrichment, has no adequate remedy at law to recover against Defendants.

293.   Therefore, equity and good conscience require restitution from Defendants.  Moreover, to protect Plaintiff's right to recover damages and to prevent Defendants' continued unjust enrichment, a constructive trust should be imposed for Plaintiff's benefit on and over LHI, the Panama Project Companies and the Project, all attendant rights and benefits from these assets, and on all sums unlawfully and inequitably received by Defendants in connection with these assets.

**SECOND CAUSE OF ACTION**
**(In the Alternative, Unjust Enrichment under Article 1643-A of the Panamanian Civil Code)**
**(Against All Defendants)**

294.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

295.    Article 1643-A of the Panamanian Civil Code provides: "Whoever has been enriched without cause, at the expense or to the detriment of another, is obligated, within the limits of the enrichment, to compensate the latter for their corresponding decrease in wealth."[21]  (Ex. 12 to Britton Decl.)

296.    In analyzing that statute, the Panamanian Civil Chamber has held that a claim of unjust enrichment requires: (a) an increase in wealth of the defendant, (b) the impoverishment of the claimant as a result of the defendant's enrichment, and (c) a lack of a legal cause justifying the enrichment and the corresponding impoverishment. (Ex. 13 to Britton Decl.)

297.    For violations of Article 1643-A of the Panamanian Civil Code, Panamanian law allows, as a remedy, for the return of unjustly gained property and economic benefits to their rightful owner.  (Britton Decl. ¶¶ 78, 82.)  In particular, where an enriched party was aware or had a reasonable basis to be aware of the

---

[21]  As codified in Article 1643-A of the Panamanian Civil Code, the laws of Panama recognize a claim of unjust enrichment.  (Britton Decl. ¶ 71.)

absence of justification in its enrichment and has not proceeded in a timely manner to remedy it, the enriched party is deemed to have unjustly enriched itself in bad faith and is required to not only return the property in question but also pay interest, and/or other contributions, such as ill-gotten profits, to the wrongfully impoverished party. (Britton Decl. ¶¶ 76-82.)

298. As alleged herein, Defendants' wealth has been unjustly increased by the receipt and retention of ownership, and all attendant benefits and rights, in LHI, the Panama Project Companies, and the Project.

299. Plaintiff was impoverished by being deprived of its majority ownership interests, and Defendants' retention of the attendant economic and other benefits and rights, in LHI, the Panama Project Companies, and the Project, without any compensation or remuneration for Plaintiff – all as a direct result of Defendants' unjust enrichment.

300. Defendants' unjust enrichment, as described, is a direct result of Plaintiff's impoverishment, because Plaintiff was illegally deprived of its ownership and voting rights in LHI, the Panama Project Companies, and the Project, and all the economic benefits derived from the same, by the Individual Defendants who used the Delaware Entities and Sinolam to implement their illicit theft scheme.

301. As such, Defendants have violated Article 1643-A of the Panamanian Civil Code in bad faith, entitling the full restitution of Defendants' unjustly acquired

shareholding and voting rights in the Panama Project Companies back to Plaintiff and all the economic benefits that Defendant could have generated through their illegal possession of the same.[22]

### THIRD CAUSE OF ACTION
**(In the Alternative, Unjust Enrichment under Barbadian Law)**
**(Against All Defendants)**

302.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

303.    Under the laws of Barbados, a claim for unjust enrichment requires a Plaintiff to prove that "(1) the Defendant must have been enriched by the receipt of a benefit; (2) the benefit must have been gained at the Plaintiff's expense; and (3) it would be unjust to allow the Defendant to retain that benefit." (Ex. 7 to Alleyne Decl.)

---

[22] There is no actual conflict between the laws of Delaware and Panama, because the application of either law "yield the same result." *Laugelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super., 2013). Therefore, this Court need not engage in the choice of law analysis. *See Deuley v. DynCorp Intern., Inc.*, 8 A.3d 1156, 1161 (2010) (when there is a false conflict, "the Court should avoid the choice of law analysis altogether"). In any event, the application of Delaware law is particularly warranted here, because (i) several Defendants are organized in Delaware; (ii) Defendants received enrichment in Delaware as the ownership and voting rights in the Panama Project Companies were divested from LHI and transferred to Defendants in Delaware; and (iii) the key property conveyed to Notarc Port as part of the Notarc Transaction is situated in Delaware because Notarc Port acquired exclusive voting rights in the Panama Project Companies by acquiring full membership interests in Coastal Partners, a Delaware LLC, from Delaware-organized Coastal Trust.

304.   Barbadian law allows restitution for unjust enrichment, provided that there is no legal ground that "overrides the rule generated by the law of unjust enrichment that entitles the Claimant to restitution." (Ex. 8 to Alleyne Decl.)

305.   Restitution under Barbadian law is a remedy that aims to restore to an impoverished party the gains that someone else has obtained from them. (Alleyne Decl. ¶ 45.) Such a remedy typically includes the return of unjustly obtained property or economic benefit from the impoverished party. (Ex. 10 to Alleyne Decl.)

306.   As alleged herein, Defendants have been unjustly enriched by the receipt of Plaintiff's majority ownership interest in LHI and the Panama Project Companies and all attendant rights and economic benefits derived therefrom.

307.   Defendants' unjust enrichment was at Plaintiff's expense, as Defendants illegally and fraudulently divested Plaintiff of its majority ownership interest in LHI and the Panama Project Companies by using forgeries, and by transferring the Panama Project Companies to Notarc Port, without Plaintiff's knowledge or consent. Further, Plaintiff did not receive any compensation or remuneration from the Notarc Transaction, which itself was a carefully structured scheme that the Individual Defendants carried out through their entities to dress up their illegal theft of Plaintiff's majority holding in LHI and the Panama Project Companies as "sale," and to exclude Plaintiff from the management and operation of the Panama Project Companies and the Project.

308.    To allow Defendants to retain LHI, the Panama Project Companies, the Project, and all economic benefits and other attendant rights thereof would be manifestly unjust, as that would effectively legitimize their fraud and theft of Plaintiff's property and investments.

309.    For the same reasons, there is no legal basis justifying Defendants' retention of unjustly gained shareholding and voting rights in LHI and the Panama Project Companies, which must be returned to Plaintiff along with the full restitution of any economic benefits that Defendant could have generated through their illegal possession of the same.[23]

## FOURTH CAUSE OF ACTION
### (Conversion Under Delaware Law)
### (Against All Defendants)

310.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

311.    Plaintiff possessed 51% of the shares in LHI[24] and thus held a majority interest in LHI's assets, including the shares of the Panama Project Companies and the assets of these companies, including the concession for and the Project itself, as

---

[23] For the same reasons as above, *supra* n.21, the Court should apply Delaware law in resolving Plaintiff's claim for unjust enrichment, because there exists no actual conflict between it and Barbadian law (or, for that matter, Panamanian law).

[24] Plaintiff is in possession of the original copy of LHI's Share Certificate No. 2 issued to Plaintiff on September 14, 2017, certifying that Plaintiff holds 51% of the stock of LHI.  (Ex. 10.)

of January 6, 2020.

312.    Given Plaintiff's ownership of these assets, it had a right to possess them and to receive the benefits of ownership, as of that date and going forward.

313.    Zhang first wrongfully divested and possessed 1% of Plaintiff's shares in LHI as if it was his own by fraudulently transferring the requisite shares to himself through non-party Gorgeous Colon on January 7, 2020.  Plaintiff was unaware of and did not consent to this transfer.

314.    Zhang then wrongfully divested and possessed the remaining 50% of Plaintiff's shares in LHI as if it was his own by fraudulently transferring these shares to himself through Sinolam on July 28, 2020.  Plaintiff was unaware of and did not consent to this transfer and would not have consented to the transfer if asked.

315.    That same day, Zhang transferred the remaining 50% of the shares in LHI that Gorgeous Colon had in its possession, including Plaintiff's 1% shares wrongfully converted on January 7, 2020, *supra* ¶ 177, to Sinolam, again without Plaintiff's knowledge or consent.  Plaintiff would not have consented to the transfer if asked.  Due to these illegal and fraudulent transfers, Sinolam acquired the title to 100% of the shares of LHI and has continued to possess 100% of the shares of LHI since July 28, 2020.

316.    Zhang has been the sole owner of Sinolam at all times.

317.    Using his illegally acquired shares in LHI through Sinolam Zhang

103

further worked with Martinez, Bowe, and Bethel to wrongfully divest 100% shareholding interest in the Panama Project Companies from LHI and transferred the same to Notarc Port and Coastal Partners, which Notarc Port now wholly owns. As a result, Notarc Port and Coastal Partners acquired the titles and interest to, and continue to possess, 100% of the shares in the Panama Project Companies as if such shares are their own.

318.    Through the fraudulent and illegal corporate actions described in ¶¶ 190-206, and the illegitimate Notarc Transaction described in ¶¶ 207-24, Zhang, Martinez, Bethel, and Bowe through the Delaware Entities and Sinolam wrongfully disposed of and possess Plaintiff's rights and interests in LHI and the Panama Project Companies.

319.    But for Defendants' unlawful conversion of Plaintiff's 51% interest in LHI, Plaintiff would have the right to immediately possess its shares in LHI and LHI's assets, including the 51% ownership of the Panama Project Companies and the Project, including before and after the conversion and through the present day.

320.    Plaintiff did not learn of Defendants' illegal actions until months later, and never consented to any of the unlawful transfers that took place between January 2020 and March 2022. Plaintiff would not have consented to the transfer if asked.

321.    Plaintiff sent cease-and-desist letters to Zhang, Bowe, Bethel, and Sinolam, among others, demanding they return Plaintiff's rightful ownership interest

and shares in LHI and the Panama Project Companies, but those letters were ignored and Defendants refused to return Plaintiff's property.

322.   Defendants' conversion of Plaintiff's 51% ownership interests in LHI, the Panama Project Companies, and the Project was fraudulent and carried out with the knowledge of Plaintiff's rightful ownership interests in the same.

323.   Therefore, equity and good conscience require the imposition of a constructive trust on the Defendants' wrongfully possessed shares and interests in LHI, the Panama Project Companies, and the assets of those companies, including the rights to the Panama Project, so that these may be returned to Plaintiff.

## FIFTH CAUSE OF ACTION
**(In the Alternative, Conversion Under Panamanian Law)**
**(Against All Defendants)**

324.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

325.   Panamanian Civil Code Title XI provides for an action for ownership ("revindication"), by which the rightful owner of a property, whether movable or immovable, can recover its property from the current possessor of the same.  (Ex. 16 to Britton Decl.)  The remedy most readily available for revindication claim under Panamanian law is the restitution to the owner of the thing of which he was dispossessed.  (Britton Decl. ¶ 88.)

326.   The elements of a revindication claim under Panamanian law are (1)

105

the claimant's right of ownership over the property sought to be recovered; (2) the possession of the property by the defendant; and (3) the clear and precise identification of the property intended to be claimed.  (Britton Decl. ¶ 87.)

327.   As alleged in ¶¶ 173-85 above, Plaintiff was the 51% owner of the LHI and its assets, including the Panama Project Companies and their assets, before being divested of those assets by Defendants through their illegal transfer scheme. Plaintiff had the unique right of ownership over the shares that comprised 51% of capital stock of LHI, and was therefore the rightful majority owner of LHI and the Panama Project Companies.

328.   Defendants are currently in wrongful possession of the property that Plaintiff rightfully owns.  Therefore, Plaintiff is entitled to a return of its property, consisting of 51% of the stock in LHI and the Panama Project Companies, that it was wrongfully dispossessed of by Defendants.

<u>**SIXTH CAUSE OF ACTION**</u>
**(In the Alternative, Conversion and Detinue Under Barbadian Law)**
**(Against All Defendants)**

329.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

330.   Under the laws of Barbados, conversion is a recognized claim defined as "an act of deliberate dealing with a chattel in a manner inconsistent with another's right whereby that other is deprived of the use and possession of it."  (Ex. 11 to

Alleyne Decl.)   As such, the elements necessary to prove conversion under Barbadian law are (1) that the plaintiff is entitled to possession or immediate possession of the chattel; and (2) that the chattel is wrongfully taken or received by the defendant not entitled to do so.  (Alleyne Decl. ¶ 47.)

331.   Where the defendant who converted the plaintiff's chattel to his or her own use refuses to deliver up the same after the plaintiff's demand, a claim in detinue may be brought against that defendant.  (Ex. 11 to Alleyne Decl.)  Under Barbadian law, conversion includes all the forms of detinue, except that of a bailee who has lost the chattel at issue.  (*Id.*)

332.   The remedy for detinue under Barbadian law includes "specific restitution, or delivery up of the chattel, or payment of its value assessed at the date of judgment together with damages for its detention."  (*Id.*)

333.   As established in ¶¶ 70-88 above, prior to the start of the illicit theft scheme in early 2020, Plaintiff was the 51% owner of LHI and its assets, including the Panama Project Companies and the rights to the Panama Project.

334.   Defendants' divesture of Plaintiff's interest in these assets – via the January 2020 and July 2020 transfers of Plaintiff's shares in LHI to Gorgeous Colon and Sinolam, and the subsequent illegal transfers of shares in the Panama Project Companies by Zhang and Martinez to Coastal Partners and Notarc Port (now purportedly owned by Bethel and Bowe, the co-conspirators of Zhang and Martinez)

107

– took place without Plaintiff's knowledge or consent, and involved forgeries and other fraudulent and illegal means as described in ¶¶ 173-85 and ¶¶ 190-206 above. Plaintiff would not have consented to the transfers if asked.

335.   A series of illegal and fraudulent transfers of Plaintiff's majority ownership interest and shares in LHI and the Panama Project Companies therefore did not break the chain of Plaintiff's entitlement to possession of the same, which survives to this day.

336.   Therefore, Defendants have wrongfully taken Plaintiff's majority ownership interest and shares in LHI and the Panama Project Companies.

337.   This wrongful retention and possession of Plaintiff's majority ownership interest and shares in LHI and the Panama Project Companies continues to date, notwithstanding Plaintiff's cease-and-desist letters demanding the return of the same to Plaintiff.  Defendants have outright refused to return Plaintiff's property, instead claiming to be rightful owners of it.

338.   Plaintiff also initiated the Barbados Action to restore its majority ownership interest and shares in LHI and the Panama Project Companies.   In response, the Individual Defendants have not only threated Plaintiff and its counsel with criminal prosecution in Panama, but also initiated the Sham Arbitration to continue their wrongful possession of and dominion over LHI, the Panama Project Companies and their assets.

339.    Plaintiff is therefore entitled to the full restitution of its majority ownership interest and shares in LHI and the Panama Project Companies, including the return and delivery of the same to Plaintiff as well as compensation for actual damages caused by Defendants' wrongful detention of Plaintiff's property to be proven at trial.[25]

## SEVENTH CAUSE OF ACTION
### (Civil Conspiracy Under Delaware Law)
### (Against All Defendants)

340.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

341.    Zhang, Bethel and Bowe began working together at least since 2019 to illegally convert Plaintiff's majority ownership interest in LHI and the Panama Project Companies and to unjustly enrich themselves by unlawfully divesting Plaintiff of its ownership interest in LHI, the Panama Project Companies, and the Panama Project.

342.    Martinez, upon information and belief, joined the illicit theft scheme in 2020.  He has since been working together with Zhang, Bethel, and Bowe, including

---

[25]    As detailed in Counts 4, 5, and 6, the application of either Delaware law, Panamanian law, or Barbadian law yields the same result.  Therefore, for the same reasons as above, *supra* n.22, the Court should apply Delaware law in resolving Plaintiff's claim for conversion.

in assisting them with the illegal theft, conversion of Plaintiff's interest in the Panama Project Companies and their assets.

343.    Zhang, Martinez, Bowe, and Bethel caused the Coastal Entities and the Notarc Entities to be formed in Delaware for purposes of carrying out and consummating their theft scheme.

344.    Zhang, Martinez, Bowe, and Bethel also changed the name of Coastal Partners to, *inter alia*, hide that entity's affiliation with them and to use it in their theft scheme.

345.    Zhang, Martinez, Bowe, and Bethel worked together with the Delaware Entities and Sinolam to commit the illegal acts described herein both in and outside of Delaware, including in ¶¶ 147-63, and detailed in the counts above.

346.    The illegal acts described herein and detailed in the counts above were committed in furtherance of the conspiracy to illegally steal and convert Plaintiff's property interest in LHI and the Panama Project Companies and to unjustly enrich Defendants to Plaintiff's detriment.

347.    The illegal acts performed by the conspiratorial combinations of Defendants were performed both in and outside of Delaware and were performed maliciously because they were purposefully done, with no lawful excuse, and to injure Plaintiff.

348.   The illegal acts involved and required the combinations of Defendants, as well as the other adjacent co-conspirators and entities, to successfully convert Plaintiff's property interests in LHI and the Panama Project Companies; by forming and utilizing the Notarc and Coastal Entities to steal and illegally obtain Plaintiff's property in Delaware.   Defendants unjustly enriched themselves by unlawfully transferring Plaintiff's ownership interest in the Panama Project Companies and the Project to Notarc Port and Coastal Partners in Delaware, all for the principal benefit of the Individual Defendants.

349.   As a direct and proximate result of Defendants' conspiracy to convert Plaintiff's property interests in LHI and the Panama Project Companies, and to unjustly enrich themselves to Plaintiff's detriment by illegally transferring these to Notarc Port and Coastal Partners in Delaware, Defendants caused actual damage to Plaintiff to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (In the Alternative, Civil Conspiracy Under Panamanian Law)
### (Against All Defendants)

350.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

351.   Illicit associations to commit crimes, such as theft or financial offenses, are substantively covered by the Panamanian Criminal Code.  (Ex. 21 to Britton Decl.)  However, the Panamanian Criminal Procedure Code provides for an optional

111

civil action of the reinstatement of the stolen thing, as well as compensation of the loss caused by the punishable act, at the discretion of the harmed party. (Exs. 22-23 to Britton Decl.)

352. Accordingly, the Panamanian Civil Code allows a victim of such a criminal act to institute a civil proceeding against the wrongdoer to seek relief from the impugned act. (Britton Decl. ¶ 90.) In so doing, the victim is not required to pursue a separate or independent criminal proceeding against the wrongdoer and is entitled to avail itself of the same remedy allowed under the Criminal Procedural Code. (Britton Decl. ¶ 91.) Essentially, Panamanian law allows a victim to pursue civil action for a criminally-defined offense. (*Id.*)

353. Zhang, Bethel, Bowe, Martinez, and their respective entities, as explained in ¶¶ 147-63 above, worked together to steal Plaintiff's majority ownership interest in LHI and the Panama Project Companies.

354. As a result of this illicit association to steal Plaintiff's property interest in LHI and the Panama Project Companies, Plaintiff has been dispossessed of its majority ownership in those companies.

355. Plaintiff therefore requests the restitution of the property that was illegally taken by Defendants as a result of their illicit association, including Plaintiff's stolen majority holding in LHI and the Panama Project Companies, as

well as compensation for actual damages caused to it by Defendants' illicit association to be proven at trial.

## NINTH CAUSE OF ACTION
### (In the Alternative, Civil Conspiracy Under Barbadian Law)
### (Against All Defendants)

356.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

357.   Under the laws of Barbados, the elements for civil conspiracy are (a) the agreement of two or more defendants (b) to effect an unlawful purpose (c) resulting in damages to the claimant.  (Exs. 12-13 to Alleyne Decl.)

358.   The remedy for civil conspiracy under Barbadian law is compensation for damages caused to Plaintiff as a result of the conspiracy.  (Alleyne Decl. ¶ 49.) Such damages include the expenses incurred by the plaintiff to expose and resist the wrongful activities of the conspirators.  (*Id.*)   Conspirators are liable as a joint tortfeasor and are jointly and severally liable for the loss caused to Plaintiff by the actions of the co-conspirators.

359.   The illegal acts described herein, including in ¶¶ 147-63 and detailed in the counts above, required the agreements of Zhang, Sinolam, Bethel, Bowe, the Delaware Entities, and Martinez.  In fact, in illegally (i) transferring Plaintiff's shares in LHI to Sinolam, (ii) expelling Plaintiff's representatives from the boards of LHI and the Panama Project Companies to replace them with Han, Bowe and

Martinez, (iii) issuing exclusive voting shares to Coastal Partners which Coastal Trust owned; and (iv) transferring all shares of the Panama Project Companies to Notarc Port, Defendants explicitly consented to and approved each relevant step in their illicit scheme, including by executing forged share transfer instruments, issuing stockholder resolutions on behalf of the Panama Project Companies without Plaintiff's knowledge and consent, and agreeing to the Notarc Transaction that sought to disguise Notarc Port as a bona fide purchaser for value of the Panama Project Companies.

360.   The Individual Defendants also worked together to form and utilize the Delaware Entities to carry out and consummate this illicit scheme.

361.   As alleged herein, the combinations and agreements of the Defendants were to effect the unlawful purposes of converting Plaintiff's property for their use and enriching themselves at Plaintiff's expense.

362.   Defendants' combinations and agreements caused damages to Plaintiff, because as a result of the same, Plaintiff is deprived of its majority ownership interest and substantial investment in LHI, the Panama Project Companies, and their assets.

363.   Plaintiff is entitled to recover all damages caused by Defendants' conspiracy to be proven at trial, including significant expenses that Plaintiff has incurred to uncover and hold Defendants accountable for their wrongdoings.[26]

### TENTH CAUSE OF ACTION
**(Declaratory Judgment That the Notarc Transaction Was Not A Valid, Legal, Bona Fide Transaction)**
**(Against All Defendants)**

364.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

365.   Declaratory relief is appropriate because an actual controversy exists between Plaintiff and Defendants as to ownership of the Panama Project Companies and the Panama Project.

366.   An actual case or controversy exists as to (i) the validity of Notarc Port's claimed ownership of the Panama Project Companies and the Panama Project, and (ii) the validity of Notarc Port's assertion that it is a bona fide purchaser for good value of the Panama Project Companies and the Panama Project.

367.   The Court's determination on these issues should be made under the laws of Delaware because several Defendants to this conspiracy are Delaware

---

[26]   As detailed in Counts 7, 8, and 9, the application of either Delaware law, Panamanian law, or Barbadian law yields the same result.  Therefore, for the same reasons as above, *supra* n.22, the Court should apply Delaware law in resolving Plaintiff's claim for conversion.

entities and/or officers or directors of Delaware entities, and were created and used by the Individual Defendants to perpetrate their illegal transfer scheme via the specific acts outlined above and carried out, in material part, in Delaware, in order to unjustly enrich themselves.

368.   As detailed herein, Notarc Port's alleged acquisition of the Panama Project Companies had significant connections to Delaware, including: the formation of Notarc Port, Coastal Partners and Coastal Trust in Delaware for purposes of carrying out the illegal transfer scheme; the change of ownership over Delaware-organized Coastal Partners between Notarc Port and Coastal Trust, both also organized under the laws of Delaware; as well as the transfer of all shares in these companies to Notarc Port.  Additionally, all of the financial benefits of owning those companies flow through to Notarc Port in this state.

369.   By acquiring Coastal Partners from Coastal Trust, Notarc Port held all voting rights in the Panama Project Companies here in Delaware, and this was an essential component of the illegal scheme and the Notarc Transaction to completely divest Plaintiff of its ownership and other rights and interest in the Panamanian Companies as well as of the Defendant's unjust enrichment.  In the end, these Delaware Entities were created and used by the Individual Defendants, including in Delaware, to consummate their illegal conversion and unjust enrichment.

370.   The Delaware Supreme Court has defined a bona fide purchaser as "one who acquires legal title to property in good faith, for valuable consideration, and without notice of any other claim of interest in the property." *Fletcher v. City of Wilmington Udag*, 2006 WL 2335237, at *2 (Del. Aug. 11, 2006).

371.   As set forth above, the Notarc Transaction was thus not an arm's length transaction.  Rather, it was organized and carried out by the Individual Defendants who have been working together to illegally divest Plaintiff of its majority ownership interest in LHI and the Panama Project Companies at least since 2019.  To date, the Individual Defendants are working together to sabotage and undermine Plaintiff's efforts to unravel their theft scheme, by initiating retaliatory criminal proceedings against Plaintiff and its counsel and by instituting the Sham Arbitration that seeks to establish Notarc Port as a bona fide purchaser of the Panama Project Companies.

372.   Notarc Port thus cannot reasonably claim to be a good faith purchaser without notice of Plaintiff's interest in LHI and the Panama Project Companies.  In acquiring the Panama Project Companies, it acted at the behest of the Individual Defendants.  The Individual Defendants' knowledge of the wrongdoings that they themselves perpetrated to carry out their illicit theft scheme is either known by and/or imputed to Notarc Port.

373.   Moreover, Notarc Port paid grossly inadequate consideration to support its acquisition of the Panama Project Companies and their assets, including the

117

Panama Project, providing another reason it cannot validly claim to be a bona fide good faith purchaser for value without notice.

374.   Defendant Notarc Port also is not a bona fide purchaser under Panamanian law, were the Court to deem it applicable to this question.

375.   Under Panamanian Civil Code Article 1762, purchasers who record their interests with the Panamanian Public Registry can be deemed bona fide purchasers and can be protected in their acquisitions by perfecting the title to the property acquired in certain circumstances.  The Panama courts have held that for this statute to apply, the purchaser must be a bona fide purchaser by: (1) acquiring the right to title in good faith; (2) paying consideration to acquire the right to title; (3) acquiring title from a seller who has the power to transfer; and (4) recording the title with the Public Registry.  (Britton Decl. ¶ 30.)

376.   Although there is no set standard for determining good faith in Panama, the Civil Code provides some statutory basis for analysis, stating that a possessor will be deemed a good faith possessor if he is unaware of a defect in his title or mode of acquisition which invalidates it; and will be considered a bad faith possessor if he is aware of such a defect.  Good faith requires the exercise of diligence to ensure that there is concordance between the reality of the Registry, and the reality outside the Registry.  (Britton Decl. ¶ 37.)  The Civil Chamber has held that this rule can be generalized to mean that a purchaser is obligated to be alert, especially when there

118

are rational means and motives sufficient to know that the transmitted title is not in accordance with that published in the Registry.  (Ex. 10 to Britton Decl.)

377.   In addition, the Panamanian court has held that in analyzing good faith, a gross difference between the sale price of the property acquired and its value can be taken into account to determine whether there was conduct other than good faith. (Britton Decl. ¶ 41.)  In other words, the paltry price Notarc Port ostensibly paid for the Panama Projects is further evidence of its bad faith in the acquisition.

378.   For the reasons stated above, Notarc Port cannot claim to be a good faith possessor without notice under Panamanian law, given that its claimed owners, Bowe and Bethel, participated in and were well aware of the duplicitous nature of the acquisition because they acted together with Zhang and Martinez to illegally transfer ownership of the Panama Project Companies from Plaintiff and its majority owned LHI to Notarc Port, and that Notarc Port did not pay any consideration or even close to the market price for the assets.

379.   Pursuant to 10 *Del. C.* § 6501 *et seq.*, Plaintiff seeks a declaration that (i) Sinolam, and by extension, Zhang, did not validly acquire any shares or ownership interests in LHI and its assets, including the Panama Project Companies, and, therefore, had no authority to sell, transfer, or otherwise dispose of LHI's assets, including the Panama Project Companies; (ii) Coastal Partners, and by extension, Coastal Trust, did not validly acquire any shares or ownership interests in the

Panama Project Companies due to Zhang's deceit; (iii) Notarc Port is not a bona fide purchaser for valuable consideration from LHI and Coastal Trust of the Panama Project Companies and the Panama Project; (iv) the acquisition of the Panama Project Companies and the Panama Project by Notarc Port be deemed void *ab initio* or voidable at Plaintiff's election; and (v) Notarc Port, and by extension, Notarc Partners and its owners Bethel and Bowe, own no shares of the Panama Project Companies and have no rights to the Panama Project.

380.   As demonstrated, the same result would hold even if the Court were to apply Panamanian law to this question.

381.   A declaratory judgement would serve various purposes in the instant case.   First, it would settle the dispute as to ownership of the Panama Project Companies and the Panama Project.   Second, it would afford relief from Notarc Port's threatened Sham Arbitration in Panama and attempts to abuse the Panamanian criminal justice system to harass and retaliate against Plaintiff, its principal and representatives, and its counsel.   Finally, it would protect this Court's jurisdiction from being circumvented by Defendants that are seeking to use the Sham Arbitration in Panama to legitimize its unjust enrichment and unwarranted ownership and control over the Panama Project Companies and the Panama Project.

## ELEVENTH CAUSE OF ACTION
### (Preliminary and Permanent Injunction – The Panama Project)
### (Against All Defendants)

382.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

383.   Notarc Port and Coastal Partners retain their ownership over and rights to the Panama Project Companies and the Project as a result of the illegal transfer scheme and conversion perpetuated by Defendants.

384.   Notarc Port and Coastal Partners thus do not legitimately own and control the Panama Project Companies and the Project.  Nor can Notarc Partners, Bethel, and Bowe claim to own and control the Panama Project Companies via Notarc Port and Coastal Partners.

385.   In carrying out the illegal theft scheme, Defendants caused the improper and illegal removal of Plaintiff's representatives from the boards of the Panama Project Companies, authorized the creation, issuance, and transfers of shares of stock of the Panama Project Companies, and encumbered the Panama Project Companies with indebtedness and liability in excess of $230 million – all without Plaintiff or its representatives' knowledge or consent.

386.   While Defendants' illegal machinations to carry out their illicit theft scheme were underway, PCCP also faced the risk of its concession rights being revoked by the PMA.  PCCP's concession rights are the cornerstone of the Project.

121

387.   Even after the Notarc Transaction, Defendants are unlawfully exercising control over the development, management, and operation of the Panama Project Companies and the Panama Project to the exclusion of Plaintiff.

388.   To mask true ownership of the Panama Project, and to continue their unjust enrichment, Defendants have also made false and misleading public representations, including to the Panamanian government, about the Project's ownership (stating that it is owned by NMG when it is not) and financial condition. These false and misleading representations threaten the good will and relationships that Plaintiff has developed with the Panamanian government and third-party contractors for the Project, including its EPC contractor.

389.   Defendants have also taken steps to sell the entirety or parts of the Panama Project to third parties.

390.   Plaintiff succeeded in temporarily halting such negotiations to sell an interest in the Panama Project Companies to TIL, by sending a cease-and-desist letter to TIL.  However, Defendants are likely engaging in similar solicitations with other parties, as they do not have the requisite resources and expertise to develop and complete the construction of the Panama Project.   Any attempt by Defendants to sell, transfer, encumber, exchange, expend, pledge, or otherwise dispose of, directly or indirectly, any shares and assets of the Panama Project Companies risks

the irretrievable loss of Plaintiff's ownership rights and economic interests in the Panama Project Companies and the Project.

391.   Plaintiff therefore faces an imminent and evident threat of being deprived of its substantial investment in the Panama Project Companies and the Panama Project, and all of the attendant rights and benefits thereto.

392.   Plaintiff has no adequate remedy at law to recover against Defendants.

393.   A preliminary and permanent injunction is needed to restrain and enjoin Defendants from taking any further action or decision detrimental to or prejudicial to Plaintiff's rights and interests in the Panama Project Companies and the Panama Project.  This includes an order enjoining them from (i) taking any action or decision in relation to the development or construction of the Panama Project without the consent of Plaintiff; (ii) discussing or attempting to negotiate a partnership, joint venture, or any similar agreement or transaction, with any third parties in connection with the ownership of the Panama Project Companies or development of the Panama Project; (iii) seeking investor(s) and funder(s) for the construction and development of the Panama Project; and/or (iv) engaging in any discussion or negotiation with third parties to sell the Panama Project Companies and the Panama Project and/or dispose of its assets in any way.

394.   The balance of equities tips in Plaintiff's favor, given that (i) it has paid a substantial amount to become a majority owner of the Panama Project Companies

and the Panama Project; (ii) it has contributed additional capital and other in-kind resources to substantially develop the Panama Project; (iii) it was wrongfully and illegally deprived of its majority ownership interest in the Panama Project Companies and the Panama Project, as well as all economic benefits and other attendant rights that it was entitled to receive from the Panama Project, as a result of the co-conspirators' scheme; (iv) Notarc Port's alleged acquisition of the Panama Project Companies and the Panama Project is clearly traceable to, and the poisonous fruit of, this illegal transfer and fraud scheme; (v) Notarc Port continues to act in concert with the main perpetrators of the illegal theft scheme, including Zhang, Martinez, Bethel, and Bowe, to subvert and defeat Plaintiff's effort to regain its majority interest in the Panama Project Companies and the Panama Project; and (vi) Notarc Port is not a bona fide purchaser for valuable consideration of the Panama Project Companies and the Panama Project.

## **TWELFTH CAUSE OF ACTION**
### **(Preliminary and Permanent Injunction – To Stop The Sham Arbitration)**
### **(Against All Defendants)**

395.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

396.   Notarc Port and Coastal Partners, along with the Panama Project Companies, initiated the Sham Arbitration in Panama on September 26, 2023 to seek a declaration from the arbitral tribunal that the Notarc Transaction is valid and

enforceable and that Notarc Port is a bona fide purchaser of the Panama Project Companies.

397.   Bowe and Bethel claim to own 100% of all of the claimants to the Sham Arbitration through Notarc Partners.  Bowe and Bethel further direct and control Notarc Port and Coastal Partners as their managers.

398.   Bowe and Bethel, along with their co-conspirator, Martinez, also direct and control the Panama Project Companies as the owners and/or directors of those companies.

399.   The respondents to the Sham Arbitration are non-party LHI and Coastal Trust, who were the sellers to the Notarc Transaction.

400.   Zhang, through Sinolam, owns 100% of LHI.  Zhang further directs and controls LHI through Han, who Zhang appointed as sole director of LHI and who works at the behest of Zhang.

401.   Martinez directs and controls Coastal Trust as trustee.  As described above, including at ¶ 161, Martinez has been working with and at the behest of Zhang, Bowe and Bethel, all of who are Martinez' co-conspirators.

402.   Given that Notarc Port, Notarc Partners, Coastal Partners, Coastal Trust, Bowe, Bethel, and Martinez are not parties to the Barbados Action, Plaintiff has no means to halt them from continuing the Sham Arbitration in that action.

403.    Zhang and Sinolam also have been attempting to allow LHI to participate in the Sham Arbitration by seeking to alter the injunctive order entered against LHI by the Barbados High Court, as described in ¶ 260.

404.    Plaintiff will suffer irreparable harm if the Sham Arbitration continues and results in an arbitral award granting Notarc Port's claim to be a bona fide purchaser for valuable consideration of the Panama Project Companies and the Panama Project.

405.    Notarc Port itself has also admitted that it would use the Sham Arbitration to block Plaintiff's access to judicial recourse and all other remedies available to it under applicable laws to attempt to regain ownership over the Panama Project Companies and the Panama Project.

406.    Notarc Port has also threatened to compel Plaintiff's participation in the Sham Arbitration.

407.    Plaintiff has no adequate remedy at law to recover against Defendants for the Sham Arbitration.

408.    Therefore, injunctive relief is the only remedy available to Plaintiff and is necessary to stop Defendants' unjust enrichment and bad faith attempt to force Plaintiff to submit to a Sham Arbitration to which Plaintiff has never agreed and in which Plaintiff could never obtain any form of justice.

409.   To prevent circumventing this Court's jurisdiction and Plaintiff suffering irreparable harm and being forced to forfeit its right to judicial resolution, Defendants should be preliminarily and permanently restrained and enjoined from further prosecuting the Sham Arbitration in Panama.

### THIRTEENTH CAUSE OF ACTION
**(Alter Ego/Piercing the Corporate Veil)**
**(Against Bowe, Bethel, Notarc Partners, and Notarc Port)**

410.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

411.   Bowe and Bethel claim to be the ultimate beneficial owners and controlling members of Notarc Port through Notarc Partners.

412.   Bowe and Bethel and/or their co-conspirators and agents created the Notarc Entities for the principal purpose of implementing and furthering the illegal schemes and conversion described herein.

413.   Bowe and Bethel utterly dominated the Notarc Entities to the extent that the Notarc Entities had no separate mind, will, or existence of their own—they did whatever Bowe and Bethel commanded.

414.   Bowe and Bethel exercised their control over the Notarc Entities to implement the brazen theft scheme along with their co-conspirators, including by causing Plaintiff's rights and interests in the Panama Project Companies to be transferred to Notarc Port.

415.    Bowe and Bethel exercised their control over the Notarc Entities to maintain illegitimate ownership and control over the Panama Project Companies, including by authorizing Notarc Port to institute the Sham Arbitration aimed at establishing Notarc Port as a bona fide purchaser of the Panama Project Companies.

416.    The Notarc Entities are inadequately capitalized to carry on their operations.

417.    The Notarc Entities failed to observe corporate formalities.

418.    The Notarc Entities are merely a façade for Bowe and Bethel's illicit operations to divest Plaintiff's ownership interest in the Panama Project Companies, and to ensure that these assets and any economic benefits flowing therefrom be made available for Bowe and Bethel and their co-conspirators', including Zhang, use and benefit.

419.    Bowe and Bethel must not be allowed to hide behind the Notarc Entities to avoid liability for converting Plaintiff's interest in LHI and the Panama Project Companies and for Defendants' unjust enrichment through the unlawful divestment of Plaintiff's ownership interest in LHI and the Panama Project Companies, which resulted in injury to Plaintiff.

420.    Plaintiff respectfully requests that the Court finds that the Notarc Entities (i) are the alter egos of Bowe and Bethel and that any causes of action or relief available against the Notarc Entities are also available directly against Bowe

and Bethel; and (ii) that Bowe and Bethel are jointly and severally liable for all damages and all equitable relief awarded to Plaintiff and against the Notarc Entities arising from the allegations and claims set forth above.

## FOURTEENTH CAUSE OF ACTION
### (In the Alternative, Alter Ego/Piercing the Corporate Veil)
### (Against Zhang and Notarc Port)

421.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

422.   Should it be revealed that Zhang owns Notarc Port through Notarc Global Hong Kong, Zhang is the ultimate beneficial owner, controlling stockholder, and sole stakeholder of Notarc Port and he utterly dominated Notarc Port to the extent that it had no separate mind, will, or existence of its own.

423.   As alleged in the counts above, Notarc Port is inadequately capitalized to carry on its operations and has failed to observe corporate formalities.

424.   Zhang, acting together with Bowe and Bethel, has deliberately been seeking to create confusion regarding the true ownership of the Panama Project Companies, including by falsely claiming that NMG Latin America owns the Panama Project Companies and by creating several entities bearing the same name "Notarc Global Investments Limited."

425. Zhang should not be allowed to benefit from this deliberate misinformation campaign, should it be revealed that he in fact owns Notarc Port (and

thus, the Panama Project Companies) through Notarc Global Hong Kong – in which case Plaintiff respectfully requests that the Court find that Notarc Port is the alter ego of Zhang.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray for relief and judgment as follows:

a.      A declaration that: (i) Notarc Port is not a bona fide purchaser of the Panama Project Companies and the Panama Project; (ii) the acquisition of the Panama Project Companies and the Panama Project is void *ab initio* or voidable at Plaintiff's election; and (iii) Notarc Port and Coastal Partners own no shares of the Panama Project Companies and have no rights over the Panama Project;

b.      A declaration that Sinolam, and by extension, Zhang, did not validly acquire any shares or ownership interests in LHI and its assets, including the Panama Project Companies, and therefore, had no authority to sell, transfer, or otherwise dispose of LHI's assets, including the Panama Project Companies;

c.      A declaration that Defendants engaged in unjust enrichment, conversion, a civil conspiracy, and other misconduct as alleged above, by the taking and retention of ownership interests in LHI, the Panama Project Companies and the Panama Project that rightfully belong to Plaintiff;

d.      A declaration that the Notarc Entities are alter egos of Bethel and Bowe, and that the latter are jointly and severally liable for all damages and all equitable

relief awarded to Plaintiff and against the Notarc Entities arising from the allegations and claims set forth herein; or, *in the alternative,* a declaration that Notarc Port is an alter ego of Zhang and that the latter is jointly and severally liable for all damages and all equitable relief awarded to Plaintiff and against Notarc Port arising from the allegations and claims set forth herein;

e.      An injunction ordering Defendants to cease prosecuting the Sham Arbitration in Panama and to litigate the issues that are the subject of that arbitration in this case;

f.      An injunction restraining and enjoining Defendants, including any of their agents, employees, officers, and representatives, from taking any further action or decision on behalf of and/or in connection with the Panama Project Companies and the Panama Project without obtaining Plaintiff's written consent, including:

(i)    enter into or agree to any transaction that could result in any sale, encumbrance, transfer, change of capital structure or other similar disposition of any securities or assets of the Panama Project Companies;

(ii)   approve or enter into any agreement of partnership, financing, investment, merger, tender offer, restructuring, or recapitalization with respect to the Panama Project Companies and the Project;

131

(iii)  authorize, create, issue, sell, transfer change the terms or rights, or commit or agree to issue, sell, transfer or change the terms or rights of any securities (including equity and debt securities), of the Panama Project Companies;

(iv)  transfer, encumber, exchange, expend, pledge, or otherwise dispose of, directly or indirectly, any assets of the Panama Project Companies;

(v)   distribute, directly or indirectly, any cash generated or other assets of the Panama Project Companies, in the form of a dividend, liquidating distribution or other payments to equity holders or lenders;

(vi)  engage or cause the Panama Project Companies to engage in, enter into, or agree to any material undertaking, guaranty, debt or surety;

(vii) alter, destroy or transfer custody or control of books and records (including any electronic records) of or related to the Panama Project Companies; and

(viii)amend, modify or repeal the organizational documents of the Panama Project Companies;

g.    An order establishing a constructive trust for the benefit of the Plaintiff on and over the Panama Project Companies and the Panama Project;

h.      An order awarding restitution to Plaintiff in an amount to be proven at trial sufficient to prevent the unjust enrichment of Notarc Port, its principals, and the other Defendants; or, *in the alternative*, compensatory damages in an amount to be determined at trial together with pre- and post-judgment interest as provided by law;

i.      An order awarding Plaintiff's reasonable costs, including attorneys' fees and expenses; and

j.      Such other legal and equitable relief as the Court deems just and proper.

<table>
<tr><td></td><td> /s/ Michael A. Barlow</td></tr>
</table>

Of Counsel:

David M. Orta (*pro hac vice forthcoming*)
Lucas Loviscek (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000

Dated: February 9, 2024

Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000

*Attorneys for Plaintiff Landbridge Port Services (Hong Kong) Ltd.*

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LANDBRIDGE PORT SERVICES (HONG KONG) LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024 - _____ |
| NOTARC PORT INVESTMENT LLC, NOTARC INVESTMENT PARTNERS LLC, COASTAL INFRASTRUCTURE PARTNERS LLC, COASTAL INFRASTRUCTURE TRUST NO. 1, LIANG ZHANG, DION L. BOWE, LESLIE C. BETHEL, COLIN MICHAEL MARTINEZ, and SINOLAM CONSULTING & TRADING HOLDINGS PTE. LTD., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### VERIFICATION AND UNSWORN FOREIGN DECLARATION OF YU SHANLONG

I, Yu Shanlong, hereby declare as follows under 10 *Del. C.* § 5351 *et seq.*:

1.    I am the General Counsel of Shandong Landbridge Group Co., Ltd. ("Landbridge Group"), a parent company of Landbridge Port Services (Hong Kong) Ltd. ("Landbridge" or "Plaintiff"), which is the plaintiff in the above-entitled action. In this role, I am responsible for overseeing legal matters involving Landbridge Group and its subsidiaries, including Landbridge.

2.     I am the authorized agent of Plaintiff and duly authorized to make this verification on its behalf.

3.     I hereby verify that I have read the foregoing Verified Complaint (the "Complaint") and that the facts recited therein are true and correct insofar as they concern the acts and deeds of Plaintiff, and are true and correct upon information and belief insofar as they concern the acts and deeds of any other person or entity.

4.     I further declare, under penalty of perjury under the law of Delaware, that the foregoing is true and correct, and that I am physically located outside of the boundaries of the United States, Puerto Rico, the United States Virgins Islands, any territory or insular possessions subject to the jurisdiction of the United States.

Executed on this 8th day of February 2024, at Rizhao, People's Republic of China.

*For and on behalf of*
Landbridge Port Services (Hong Kong) Limited
嵐橋港業（香港）有限公司

Yu Shanlong

*Authorized Signature(s)*

Yu Shanlong,
General Counsel of Shandong Landbridge Group Co., Ltd.
Authorized Agent of Landbridge Port Services (Hong Kong) Ltd.

2

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes. Nothing in this document shall be deemed binding for purposes of the merits of the case.

1. Case caption:

*Landbridge Port Services (Hong Kong) Ltd. v. Notarc Port Investment LLC, Notarc Investment Partners LLC, Coastal Infrastructure Partners LLC, Coastal Infrastructure Trust No. 1, Liang Zhang, Dion L. Bowe, Leslie C. Bethel, Colin Michael Martinez, and Sinolam Consulting & Trading Holdings PTE. Ltd.*

2. Date filed: **February 9, 2024**

3. Name and address of counsel for plaintiff(s):

**Michael A. Barlow (#3928)**      **Quinn Emanuel Urquhart & Sullivan, LLP**
**500 Delaware Avenue, Suite 220**
**Wilmington, Delaware 19807**

4. Short statement and nature of claim(s) asserted:

**Complaint for declaratory judgment, unjust enrichment, conversion, civil conspiracy, a temporary restraining order, and a preliminary and permanent injunction, seeking to invalidate and reverse various illegal transactions, declare that certain of the Defendants are not bona fide third-party purchasers, enjoin defendants from proceeding with an arbitration in Panama and to take other actions in relation to certain companies that Plaintiff alleges Defendants took from it illegally.**

5. Substantive field of law involved (check one):

| | | |
|---|---|---|
| ____Administrative law | ____Labor law | ____Trusts, Wills and Estates |
| ____Commercial law | ____Real Property | ____Consent trust petitions |
| ____Constitutional law | ____348 Deed Restriction | ____Partition |
| **_X_** Corporation law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
| ____Trade secrets/trade mark/or other intellectual property | | ____Other |

6. Identify any related cases, including any Register of Wills matter. This question is intended to promote jurisdiction efficiency by assigning cases involving similar parties or issues to a single judicial officer. By signing this form, an attorney represents that the attorney has done reasonable diligence sufficient to respond to this question. **N/A**

7. State all bases for the court's exercise of subject matter jurisdiction by citing to the relevant statute. Specify if 8 *Del. C.* § 111, 6 *Del. C.* § 17-111, or 6 *Del. C.* § 18-111. State if the case seeks monetary relief, even if secondarily or in the alternative, under a merger agreement, asset purchase agreement, or equity purchase agreement. **10 *Del. C.* § 341; 10 *Del. C.* § 6501**

8. If the complaint initiates a summary proceeding under Sections 8 *Del. C.* §§ 145(k), 205, 211(c), 220, or comparable statutes, check here: __ (If #8 is checked, you must either (i) file a motion to expedite with a proposed form of order identifying the schedule requested or (ii) submit a letter stating that you do not seek an expedited schedule and the reason(s)—e.g., you have filed to preserve standing and do not seek immediate relief.)

9. If the complaint is accompanied by a request for a temporary restraining order, a preliminary injunction, a status quo order, or expedited proceedings other than in a summary proceeding, check here **_X_**. (If #9 is checked, a motion to expedite <u>must</u> accompany the transaction with a proposed form of order identifying the schedule requested.)

10. If counsel believe that the case should not be assigned to a Master in the first instance, check here and attach a statement of good cause. **_X_**

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)

## <u>STATEMENT OF GOOD CAUSE</u>

I am an attorney at Quinn Emanuel Urquhart & Sullivan, LLP and a member in good standing of the Bar of the State of Delaware.  With my firm, I am counsel to Plaintiff Landbridge Port Services (Hong Kong) Ltd. ("Plaintiff").  Plaintiff respectfully submits that this action is inappropriate for submission to a Magistrate in the first instance and should proceed directly before the Chancellor or a Vice Chancellor, because it involves a request for expedited injunctive relief.

OF COUNSEL:

David M. Orta (*pro hac vice forthcoming*)
Lucas Loviscek (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000

Dated: February 9, 2024

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
(302) 302-4000

*Attorneys for Plaintiff Landbridge Port Services (Hong Kong) Ltd.*

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LANDBRIDGE PORT SERVICES (HONG KONG) LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024 -_____ |
| NOTARC PORT INVESTMENT LLC, NOTARC INVESTMENT PARTNERS LLC, COASTAL INFRASTRUCTURE PARTNERS LLC, COASTAL INFRASTRUCTURE TRUST NO. 1, LIANG ZHANG, DION L. BOWE, LESLIE C. BETHEL, COLIN MICHAEL MARTINEZ, and SINOLAM CONSULTING & TRADING HOLDINGS PTE. LTD., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## CERTIFICATION PURSUANT TO RULE 65(b)

Pursuant to Court of Chancery Rule 65, I certify that on February 9, 2024, contemporaneously with the filing of this certification to the extent possible, my firm will send an email notifying (i) Liang Zhang (at kennethzhang.esq@gmail.com and kenneth.zhang@gorgeous.com.cn) as well as his and Sinolam Consulting & Trading Holdings PTE. LTD.'s counsel in other proceedings, Ms. Harvey-Read (at LRead@hastings-attorneys.com), (ii) Notarc Port Investment LLC and Coastal Infrastructure Partners LLC's counsel in other proceedings, Messrs. Joseph R. Profaizer (at joeprofaizer@paulhastings.com) and Brad Bondi (at

bradbondi@paulhastings.com); (iii) Messrs. Dion L. Bowe (at dion@notarc.com) and Leslie Bethel (at lbethel@notarc.com), who are also managing members of Notarc Investment Partners LLC; and (iv) Coastal Infrastructure Trust No. 1 and its trustee and legal representative, Mr. Colin Michael Martinez (at legal@coastal-infrastructure.com), all of against which Plaintiff is seeking a temporary restraining order as described in the Verified Complaint filed in this action. In the email, I will also enclose a copy of the Verified Complaint and accompanying filings.

|  |  |
|---|---|
| | ___/s/ Michael A. Barlow___ |
| | Michael A. Barlow (#3928) |
| OF COUNSEL: | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| David M. Orta (*pro hac vice forthcoming*) | 200 Delaware Avenue, Suite 220 Wilmington, Delaware 19801 |
| Lucas Loviscek (*pro hac vice forthcoming*) | (302) 302-4000 |
| QUINN EMANUEL URQUHART & SULLIVAN, LLP | *Attorneys for Plaintiff Landbridge Port Services (Hong Kong) Ltd.* |
| 1300 I Street NW, Suite 900 Washington, D.C. 20005 | |
| (202) 538-8000 | Words:  150 / 3,000 |

Dated:  February 9, 2024

2

**quinn emanuel** trial lawyers | wilmington

500 Delaware Avenue, Suite 220 Wilmington, Delaware 19801 | TEL (302) 302-4000 FAX (302) 302-4010

WRITER'S DIRECT DIAL NO.
+1 (302) 302-4030

WRITER'S EMAIL ADDRESS
MICHAELBARLOW@QUINNEMANUEL.COM

February 9, 2024

**VIA FILE & SERVEXPRESS**

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11600
Wilmington, Delaware 19801

Re:    *Landbridge Port Services (Hong Kong) Ltd. v. Notarc Port Investment LLC,
       et al.*, C.A. No. 2024-   -    (Del. Ch.)

Dear Register in Chancery:

Plaintiff Landbridge Port Services (Hong Kong) Ltd. ("Plaintiff") certifies

compliance with Court of Chancery Rule 5.1 in accordance with Rule 5.1(c).  In

connection with the confidential filings of its Verified Complaint (the "Complaint"),

Exhibit 9 to the Complaint, and Opening Brief in Support of its Motion for a

Temporary Restraining Order and Preliminary Injunction (the "Brief") (collectively,

the "Confidential Filings") in the above-referenced action, Plaintiff will use its best

efforts to give actual notice to each person who could have legitimate interest in

designating information in the Confidential Filings as confidential.  Plaintiff will file

public versions of the Complaint and the Brief in compliance with Court of Chancery

**quinn emanuel urquhart & sullivan, llp**
AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MUNICH |
NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY |
STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

**quinn emanuel** trial lawyers | wilmington

500 Delaware Avenue, Suite 220Wilmington, Delaware 19801 | TEL (302) 302-4000 FAX (302) 302-4010

Rule 5.1.

I am available at your convenience should you have any questions.

Respectfully,

 /s/ *Michael A. Barlow*

Michael A. Barlow (#3928)

Words:  125
Word Limit:  1,000

2